**UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS**

**UNITED STATES**

**v.**

**Staff Sergeant KEITH L. LOVELY**
**United States Air Force**

**ACM 38215**

**30 April 2014**

**\_\_\_\_ M.J. \_\_\_\_**

Sentence adjudged 18 May 2012 by GCM convened at Misawa Air Base, Japan. Military Judge: Vance H. Spath.

Approved Sentence: Dishonorable discharge, confinement for 7 years, and reduction to E-1.

Appellate Counsel for the Appellant: Captain Christopher D. James (argued); Colonel Patrick J. Wells; and Major Ja Rai A. Williams.

Appellate Counsel for the United States: Captain Richard J. Schrider (argued); Colonel Don M. Christensen; Lieutenant Colonel C. Taylor Smith; Major Daniel J. Breen; and Gerald R. Bruce, Esquire.

Before

ROAN, HELGET, and WEBER
Appellate Military Judges

OPINION OF THE COURT

This opinion is subject to editorial correction before final release.

WEBER, Judge:

A panel of officer and enlisted members at a general court-martial convicted the appellant, contrary to his pleas, of two specifications of involuntary manslaughter, two specifications of negligent homicide, and one specification of child endangerment, in violation of Articles 119 and 134, UCMJ, 10 U.S.C. §§ 919, 934. The adjudged and

approved sentence consisted of a dishonorable discharge, confinement for 7 years, and reduction to E-1.

The appellant raises nine issues on appeal: (1) Whether the military judge abused his discretion in denying a defense motion to suppress the appellant's statements to investigators who did not advise him of his rights under Article 31(b), UCMJ, 10 U.S.C. § 831(b); (2) Whether the military judge abused his discretion in denying a defense motion to suppress the appellant's statements to investigators after he stated he wanted an attorney; (3) Whether the evidence was legally and factually sufficient to convict the appellant of three of the specifications where the Government did not demonstrate what constituted "appropriate medical care"; (4) Whether the appellant's due process right to timely post-trial review was denied when 160 days elapsed between the completion of trial and the convening authority's action; (5) Whether the record of trial is incomplete because it does not contain an appellate exhibit of a video the appellant showed the members; (6) Whether the appellant received ineffective assistance of counsel when his civilian counsel conceded his guilt during sentencing; (7) Whether the military judge abused his discretion in issuing sentencing instructions that implied the appellant would receive a sentence of more than one year of confinement; (8) Whether the military judge abused his discretion in denying the appellant's motion to merge all charges and specifications for sentencing purposes; and (9) Whether the military judge abused his discretion when he determined a civilian doctor was unavailable and ordered him deposed.

Concerning the appellant's first assigned error, we hold the military judge erred in finding investigators did not violate the appellant's Article 31(b), UCMJ, rights. However, we find no material prejudice resulted to the appellant's substantial rights, even assuming the subsequent interviews should have also been suppressed. We separately find the appellant's convictions on Specification 2 of Charge I, Specification 2 of Charge II, and the Specification of the Additional Charge legally and factually insufficient. We find none of the appellant's remaining assignments of error warrants relief. Finally, we reassess the appellant's sentence.

*Background*

The appellant enlisted in the Air Force in September 2006, soon after he married his wife. Three years later, the couple gave birth to a son, LL, on 8 August 2009. LL was healthy at birth and remained so for the first several months of his life, including throughout the appellant's deployment from November 2009 to June 2010. However, on 12 July 2010, soon after the appellant's return from deployment, the appellant and his wife brought LL to the base medical clinic complaining that LL was holding a plastic comb and accidentally poked himself in the eye. A medical exam noted a minor eye injury. The appellant and his wife again brought LL to the clinic on 13 August 2010, soon after LL's first birthday. The appellant and his wife reported LL hit his head on a

television stand, which resulted in him crying, sleeping longer than normal, and eating less. This injury took place around the time of another, purportedly less serious, fall. The appellant was in charge of LL's care when the reported fall on the television stand took place. The base medical clinic referred LL to a local facility in Japan to receive a CT scan, but that facility could not accomplish the scan because LL could not lie still. As a result, another provider at the base clinic re-examined LL and observed LL had begun playing and smiling. LL was held for observation overnight and then released, because his condition had apparently improved.

LL's parents brought him to the clinic two more times in the ensuing days. On 19 August 2010 he had a regularly scheduled checkup. LL's mother noted he had returned to normal behavior, and the visit was otherwise unremarkable. A routine neurological exam did not reveal any concerns, and LL's mother stated LL was acting normally. On 25 August 2010, LL had a routine follow-up visit at the clinic from the checkup six days earlier. Both parents attended this visit, and they reported LL had experienced a fever, was vomiting, and had been acting fussy, but that the symptoms had since resolved themselves. The examining doctor's routine neurological exam noted no concerns, and the physician opined LL had most likely had experienced a virus. Neither parent mentioned LL experienced any recent injuries, including head injuries.

The appellant's wife left home that same night to attend a church function. The appellant remained home with LL, as he was on leave. At some point after the appellant's wife left, the appellant called 911 reporting LL suddenly went limp, was vomiting, and had clear fluid coming out of his nose. The appellant performed cardiopulmonary resuscitation on LL as paramedics responded. Paramedics transported LL to the base clinic for stabilization and then to a local hospital, where he was pronounced dead a few hours later, despite lifesaving efforts. The appellant accompanied LL to the clinic and to the local hospital. Medical personnel repeatedly asked the appellant about any issues that could have caused LL's condition and specifically asked him about any recent head trauma. Despite the reported head injury to LL 12 days earlier, the appellant repeatedly denied LL had sustained any head injury and stated LL had no significant medical history apart from eczema and a prior virus.

An autopsy later determined LL died of blunt force trauma to the head. LL suffered at least two subdural hematomas, one recent and one approximately two weeks old. The autopsy also revealed LL had bruising on the front, top, and back of his head, and bleeding in the subarachnoid level of his brain. Medical examination also revealed LL had not received any skull fractures, and no injuries were noted on LL except for the head injury.

An Air Force Office of Special Investigations (AFOSI) agent interviewed the appellant the morning after LL's death. The appellant told Special Agent (SA) SS that LL had hit his head on a television stand two weeks earlier, but did not mention any other

falls or accidents LL had sustained. In October 2010, SA SS re-interviewed the appellant after receiving the preliminary autopsy report. At that interview, the appellant stated for the first time that LL had sustained an accident the day before his death. The appellant stated he had given LL a bath and while getting out of the bathtub and holding LL, LL bumped his head and sustained a dime-sized bruise over his left eyebrow. Neither of these interviews was preceded by a rights advisement.

The appellant and his wife then transferred from Misawa Air Base, Japan, to Little Rock Air Force Base (AFB), Arkansas. On 12 January 2011, a different AFOSI agent interviewed the appellant, this time pursuant to a rights advisement. The appellant reported he "had no involvement in [his] son's death," and denied that LL hit his head on the bathtub the day before his death. The appellant did report, however, that as he got out of the bathtub while holding LL, he slipped and LL hit his head on the appellant's body. Later in the interview, the appellant recounted LL did in fact hit the back of his head on the side of the bathtub. The appellant told the AFOSI agent LL acted normally after the fall, but he then told the AFOSI agent he believed this incident caused LL's death.

AFOSI agents conducted two more follow-up interviews, again under rights advisement, with the appellant in the ensuing weeks. In the first, the appellant stated he was "positive" LL hit his head on the bathtub, LL did not cry afterward or behave abnormally, the appellant did not drop LL as he fell, and that he felt guilt over LL's death but there was nothing he could have done to prevent it. In the second, AFOSI agents confronted the appellant with a medical review that indicated the accidents the appellant had described could not account for LL's injuries, along with some inconsistencies in his accounts of the accidents to that point. The appellant told AFOSI agents that he had been "holding in" the fact that he had been holding LL when he fell in the bathtub the day before LL's death, and that he had known all along LL hit his head on the bathtub. He told agents he did not mention this at the medical appointment on the morning of LL's death, or to medical personnel after the 911 call, because he was afraid his wife would blame him for not taking proper care of LL. The appellant stated LL had hit his head with a "loud thump" and with a force of level eight or nine on a scale of ten.

The autopsy and subsequent medical evaluation of LL revealed findings inconsistent with the appellant's account of LL's accidental injuries. Specifically, the medical exams found more than two injuries to LL's head, opposed to the two falls the appellant described. Medical experts opined that the falls the appellant described were unlikely to cause LL to experience subdural hematomas, and if the appellant's account of the bathtub accident had caused LL's death, LL would have demonstrated a steadily worsening condition and would not have behaved the way he was described to have behaved in the hours leading up to the 911 call. Several physicians involved in LL's treatment as well as two medical experts who conducted post-mortem studies of LL testified at trial. The physician who conducted LL's autopsy rendered his opinion that LL's manner of death was homicide caused by blunt force injury to his head. A

physician who conducted a post-mortem study of LL's eyes opined damage to LL's optic nerve was "very convincing" of non-accidental trauma. Both experts testified that LL's injuries were not characteristic of the types of falls the appellant described.

Further relevant facts are detailed for each assignment of error below.

*Defense Motion to Suppress Initial Statements to Investigators*

The defense moved at trial to suppress the appellant's statements in the 26 August 2010 and 19 October 2010 interviews, arguing that AFOSI was required to read the appellant his rights under Article 31(b), UCMJ, before questioning him. After hearing witness testimony, receiving documentary evidence, and entertaining the arguments of counsel on this motion, the military judge denied the defense motion to suppress. His detailed written ruling concerning the 26 August 2010 interview included the following summarized findings of fact:

- AFOSI investigates any active duty or dependent death within its jurisdiction. They conduct these inquiries or investigations routinely to provide a comprehensive report regarding these deaths.

- AFOSI first interviewed the appellant within one day of LL's death. Before that first interview, the agent had talked with first responders and an AFOSI forensic consultant. He had not talked with the treating physician at the off-base hospital, and he had not reviewed medical records from the off-base hospital. He had spoken with the treating physician at the base clinic, who indicated LL had suffered a subdural hematoma, and that this injury was a classic injury in "shaken-baby syndrome." However, the treating physician at the base clinic also told the AFOSI agent that there was no evidence of child abuse in this case; there were no external wounds or injuries; and subdural hematomas could result from accidental trauma.

- AFOSI interviewed the appellant as it would a witness, not a subject. The agent did not use the tactics or tricks it normally might employ with a suspect. The interview with the appellant – and an interview that same day with the appellant's wife – took place at their residence, not the AFOSI office. The appellant and his wife gave largely consistent accounts of what happened leading up to LL's death.

- The AFOSI agent focused on obtaining a timeline of events leading up to LL's death, specifically on the 48 hours preceding the death.

Concerning the second interview on 19 October 2010, the military judge found the following summarized facts:

- The interview was conducted at the AFOSI detachment. Before this interview, the AFOSI agent had received a preliminary autopsy report. This report did not list a cause of death, but it did note LL had suffered two subdural hematomas, one older and one more recent. The AFOSI agent spoke with the medical examiner who conducted the autopsy before conducting the interview. Additionally, AFOSI had reached out to Dr. SM, a child abuse expert, before the interview.

- The focus of this interview was to resolve the fact that the appellant and his wife both identified a previous injury to LL but they placed the injury on opposite sides of LL's head. The agent was also interested in determining additional instances of accidental trauma that would account for the earlier subdural hematoma.

- AFOSI was aware that LL was a clumsy child who suffered multiple falls and accidents. AFOSI had also interviewed several neighbors of the appellant and his wife; none of the neighbors provided any information that would indicate a history of abuse.

- AFOSI again treated the interview as a witness interview, not the interview of a suspect. AFOSI did not have the appellant escorted to the interview, as it normally would with a suspect.

The military judge found the testimony of the AFOSI agent who conducted these two interviews to be credible.

After the interview, the appellant consented to allow AFOSI to search his home. The consent form did not appear in the original record of trial, as neither party submitted it in motion practice. However, on appeal the appellant successfully moved to attach the consent form. The consent form states the appellant was advised "that the nature of the offenses(s) of which I am suspected (matters concerning which I may have knowledge) is/are as follows: Infant Death."

"A military judge's denial of a motion to suppress a confession is reviewed for an abuse of discretion." *United States v. Chatfield*, 67 M.J. 432, 437 (C.A.A.F. 2009) (citations omitted). Under this standard, the military judge's findings of fact are upheld unless they are clearly erroneous or unsupported by the record; however, we review de novo any conclusions of law supporting the denial of a motion to suppress a confession. *Id.*; *United States v. Swift*, 53 M.J. 439, 446 (C.A.A.F. 2000). "A military judge abuses his discretion when (1) the findings of fact upon which he predicates his ruling are not supported by the evidence of record; (2) if incorrect legal principles were used; or (3) if his application of the correct legal principles to the facts is clearly unreasonable." *United*

*States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citing *United States v. Mackie*, 66 M.J. 198, 199 (C.A.A.F. 2008)). "Further, the abuse of discretion standard of review recognizes that a judge has a range of choices and will not be reversed so long as the decision remains within that range." *United States v. Gore*, 60 M.J. 178, 187 (C.A.A.F. 2004) (citing *United States v. Wallace*, 964 F.2d 1214, 1217 n.3 (D.C. Cir. 1992)). However, our superior court has clearly indicated that despite the "abuse of discretion" label applied to our review of such issues, the ultimate determination of whether a person interviewed is a suspect is a question of law we review de novo. *United States v. Muirhead*, 51 M.J. 94, 96 (C.A.A.F. 1999) (citing *United States v. Miller*, 48 M.J. 49, 54 (C.A.A.F. 1998)). We therefore give no deference to the military judge's ultimate ruling, though his factfinding is reviewed under a clearly erroneous standard.

Article 31(b), UCMJ, states:

No person subject to this chapter may interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

Thus, if a person subject to the UCMJ interrogates or requests any statement from a person suspected of an offense, the questioner must advise the person of his or her rights under Article 31(b), UCMJ. "Whether a person is a suspect is an objective question that 'is answered by considering all the facts and circumstances at the time of the interview to determine whether the military questioner believed or reasonably should have believed that the servicemember committed an offense.'" *Swift*, 53 M.J. at 446 (quoting *United States v. Good*, 32 M.J. 105, 108 (C.M.A. 1991)). This standard of suspicion necessary to invoke the rights advisement requirement involves a "relatively low quantum of evidence," but it must amount to "more than a hunch" that the person committed an offense. *Id.* at 447.

In a somewhat analogous case to the instant matter, our superior court in *Muirhead* held the military judge should have suppressed unwarned statements Muirhead made to investigators. Investigators questioned Muirhead without a rights advisement after he brought his daughter to the hospital with vaginal injuries. The military judge found the appellant's responses to the questions admissible, noting investigators did not believe Muirhead was a suspect and there were not enough facts to lead them to reasonably believe the appellant should have been considered a suspect. The Court of Criminal Appeals affirmed the military judge's ruling, "relying heavily on the fact that both [investigators] testified they did not consider [Muirhead] to be a suspect when the statements were obtained." *Muirhead*, 51 M.J. at 97 (citing *United States v. Muirhead*,

48 M.J. 527, 536-37 (N.M. Ct. Crim. App. 1998)). Our superior court observed that both the military judge and the service court "placed great weight on the subjective opinions of the agents as to whether Article 31(b)[, UCMJ,] rights were required. However, this is the wrong test, for the issue must be viewed objectively." *Id.* (citing *United States v. Meeks*, 41 M.J. 150, 161 (C.M.A. 1994)). The Court concluded that a reasonable person in the investigators' situation would have considered Muirhead a suspect, based on factors such as: Muirhead took his daughter to the emergency room; the injuries to the daughter were suspicious; the findings of the rape kit were "tantamount to a finding of sexual abuse"; and the reason listed on a consent form for searching Muirhead's home was "suspected child abuse." *Id.*

Here, the military judge found SA SS did not subjectively believe the appellant was a suspect at the time of either the 26 August 2010 or the 19 October 2010 interview. We consider this a finding of fact, as it involves "things, events, deeds or circumstances that 'actually exist' as distinguished from 'legal effect, consequence, or interpretation.'" *United States v. Cossio*, 64 M.J. 254, 257 (C.A.A.F. 2007) (quoting *Black's Law Dictionary* 628 (8th ed. 2004)). The military judge was in the best position to judge SA SS's credibility, and evidence was presented to support the conclusion that SA SS subjectively did not believe the appellant was a suspect at the time of either interview. The agent's own actions generally confirm he did not consider the appellant to be a suspect, as he did not interview the appellant at the AFOSI office for the first interview, did not have the appellant escorted to the AFOSI office for the second interview, did not use tactics AFOSI would typically use on a suspect at either interview, and did not record either interview. The military judge's finding of fact that SA SS did not subjectively consider the appellant to be a suspect at the time of either interview is not clearly erroneous.

However, this does not settle the question of whether AFOSI objectively should have suspected the appellant of an offense. We recognize SA SS's subjective intent in questioning the appellant is somewhat relevant to the objective question before us, as his subjective intent may help demonstrate what a reasonable person in his situation should believe. *Cf. Rhode Island v. Innis*, 446 U.S. 291, 301-02 n.7 (1980) ("This is not to say that the intent of the police is irrelevant, for it may well have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response."). Nonetheless, the ultimate question is one of objective reasonableness, and SA SS's subjective intent is not determinative of this issue.

The military judge determined a reasonable person in the position of AFOSI agents would not have suspected the appellant of an offense at either interview. Under a de novo standard reviewing this conclusion of law, we find a reasonable person in SA SS's position reasonably would not have suspected the appellant committed an offense at the time of the 26 August 2010 interview. At the time of that interview, which took place just hours after LL's death, SA SS had two main pieces of information that

indicated the appellant may have killed LL: the appellant was home alone with LL when the 911 call came in, and LL had suffered a subdural hematoma, which may or may not have been associated with shaken baby syndrome. LL could have died from a medical condition, an accident, actions of the appellant's wife or at the appellant's hands; all possibilities were reasonably open at that point and there was only minimal information to indicate one possibility was more likely than another. Many cases of child deaths do not result in findings of criminal activity by the parents. Considering the limited information available on 26 August 2010, we find that an objectively reasonable person in SA SS's position would not have suspected the appellant killed his infant child.[1]

The 19 October 2010 interview represents a different situation, however. By that point, SA SS knew LL had suffered more than one subdural hematoma, and the previous accident offered by the appellant and his wife could not explain the presence of multiple injuries of this type. In addition, SA SS had reviewed LL's medical records and had learned each of LL's reported injuries took place when the appellant was watching LL. Notably, SA SS had taken the step of reaching out to a child abuse specialist for a consult and had gone so far as to list the appellant as the possible source of LL's injuries on the request form, because the appellant was the caregiver when LL suffered his fatal injury.[2]

---

[1] We granted the appellant's motion to attach the consent to search form to the record, but we find it adds nothing of substance to our analysis on this issue. The consent form merely states the appellant is either suspected of the offense of "infant death," or he may have knowledge of the matter of infant death. Neither option is selected on the form.

[2] Special Agent SS testified during cross-examination as follows with regards to the form submitted to the child abuse pediatrician:

> Q. Anywhere on that request form, did it ask who is possibly the – who's the source of the child abuse?
>
> A. It does.
>
> Q. Who did your office put down in [the child abuse pediatrician's] request? Who did your office put down as the possible source of the injuries?
>
> A. We listed the accused as being in the care of [LL].
>
> . . . .
>
> Q. At that time, even when you're writing in his name, you never equated that to being a suspect?
>
> A. No sir, it was a pre-designated form that required an entry.
>
> Q. Was there ever any discussion about putting unknown or not known at this time?
>
> A. No, sir.
>
> Q. Was there any conversation about putting [the accused's wife]?
>
> A. There were no conversations about it, no. I believe we put the accused's name on the account that he had been with [LL] just before his passing.

Perhaps most importantly, before the 19 October 2010 interview, SA SS had learned that for LL's injuries to have been caused by an accident, he would have had to had to experience a "significant fall or a car accident." The previous statements by the appellant and his wife and the medical records were not consistent with such an accident.

The military judge's ruling omitted any mention of this last crucial fact. Instead, the military judge noted the purpose of the second interview was "to explore accidental trauma history with [LL] and ensure that the accidents would then be consistent with the injuries noted." However, the military judge's ruling misses the point. By the time of the 19 October 2010 interview, the appellant had already been given two opportunities to come forward with any accidental history that might explain LL's injuries: first to medical personnel the night of LL's death and second to SA SS in his initial interview. Neither time did the appellant provide sufficient information to demonstrate LL's death was an accident.

Medical personnel may not have had enough information as of 19 October 2010 to determine a medical cause of death, but by that point SA SS should have had "more than a hunch" that the appellant had caused LL's death. At the time of the October interview, only three reasonable possibilities remained as to the cause of LL's death: (1) LL suffered non-accidental trauma at the hands of the appellant's wife; (2) LL suffered non-accidental trauma at the hands of the appellant; or (3) LL suffered one or more accidents. Natural causes had essentially been ruled out by that point. There was no reason to suspect the appellant's wife; she was not home with LL at the time of the 911 call and she had been LL's primary caregiver during the appellant's deployment without any reported injuries to LL during that time. SA SS also had no indication whatsoever that LL had sustained the type of accidental injury from a "significant fall or car accident" that might explain his death. The most reasonable explanation by 19 October 2010 was that the appellant killed his son through non-accidental trauma. AFOSI's own actions in requesting the assistance of a child abuse expert to review the medical evidence indicate non-accidental trauma at the hands of the appellant was the most plausible explanation for LL's death by the time of the 19 October 2010 interview.

SA SS testified that by 19 October 2010, the possibility of an accident was still "on the table." Indeed, AFOSI agents conducting interviews of a suspect should always consider every option still "on the table." Sometimes servicemembers suspected of a crime come up with plausible innocent explanations for the evidence against them. Sometimes evidence that apparently implicates a suspect turns out to be unreliable. This does not mean, however, that rights advisements are not required whenever investigators are open to various possibilities. If rights advisements were only required when an innocent explanation was no longer "on the table," Article 31(b), UCMJ, would ring hollow and rights advisements would almost never be required. Instead, the threshold is a "low quantum" of evidence amounting to "more than a hunch." *Swift*, 53 M.J. at 447. Here, the most likely explanation for LL's death was a criminal act by the appellant, and

10                                                                      ACM 38215

there was evidence weighing against the plausibility of alternative explanations. Thus, a rights advisement was required. We therefore find that SA SS violated the appellant's Article 31(b), UCMJ, rights.

The question remains whether the remainder of the appellant's statements to AFOSI in early 2011 should have been suppressed as tainted by the improper 19 October 2010 interview. "Where an earlier statement was 'involuntary' only because the accused had not been properly warned of his Article 31(b), UCMJ, rights, the voluntariness of the second statement is determined by the totality of the circumstances." *United States v. Gardinier*, 65 M.J. 60, 64 (C.A.A.F. 2007) (citing *United States v. Brisbane*, 63 M.J. 106, 114 (C.A.A.F. 2006)). "The earlier unwarned statement is a factor in this total picture, but it does not presumptively taint the subsequent statement," and the absence of a cleansing statement in the later interrogations is not necessarily fatal to a finding of voluntariness. *Id.* Evidence that is challenged as derivative evidence from an improperly obtained statement may be admitted if the Government demonstrates by a preponderance of the evidence that the subsequent statements were made voluntarily, the evidence was not obtained by using the improperly obtained statement, or the evidence would have been obtained even if the earlier statement had not been made. Mil. R. Evid. 304(e)(3).

We assume without deciding that the appellant's statements obtained after the 19 October 2010 interview were tainted by the improperly obtained statement.[3] We need not definitively rule on this point, however, as even if the subsequent statements should not have been admitted, we find no substantial prejudice to a material right of the appellant. A violation of Article 31(b), UCMJ, is not necessarily equivalent to a constitutional violation, and therefore the Government need not demonstrate that a violation of Article 31(b), UCMJ, is harmless beyond a reasonable doubt to prevail on appeal. *Gardinier*, 65 M.J. at 64. Rather, the erroneous admission of an appellant's statements "must be reviewed using a harmless-error analysis to determine if [the appellant] was materially prejudiced. Error not amounting to a constitutional violation will be harmless if the factfinder was not influenced by it, or if the error had only a slight effect on the resolution of the issues of the case." *Muirhead*, 51 M.J. at 97 (citing *United States v. Barnes*, 8 M.J. 115-16 (C.M.A. 1979)). *See also United States v. Cohen*, 63 M.J. 45 (C.A.A.F. 2006) (holding that a military judge's error in admitting unwarned statements did not prejudice the appellant, as the prosecution presented testimony of eyewitnesses to the charged events along with photographs taken by the appellant during the incident, the members acquitted him of one specification involving the unwarned

---

[3] At the 19 October 2010 interview, the appellant first reported that LL had hit his head on the bathtub the day before his death. Subsequent interviews focused heavily on the reported accident in the bathtub, and at the first interview following the 19 October 2010 unwarned interview, the Air Force Office of Special Investigations agent promptly began asking the appellant to clarify his earlier statements about the reported bathtub incident. Additionally, none of the interviews in January 2011 included a "cleansing statement" by investigators that might help alleviate any taint from the improper 19 October 2010 interview.

statement and the appellant pled guilty to another specification involving his unwarned statement).

This case does not involve a constitutional violation, as the appellant's 19 October 2010 interview was noncustodial. Under the facts of this case, we are convinced any error in admitting the appellant's 19 October 2010 statements and statements made in subsequent interrogations was not prejudicial. The only substantive piece of information gleaned from these declarations was the appellant's shifting account about the alleged fall in the bathtub the day before LL's death. The prosecution introduced medical evidence showing the improbability of the appellant's accounts, and asserted that the implausibility of the bathtub accounts demonstrated the appellant was attempting to cover up his guilt. Without this line of attack, however, the Government still possessed ample evidence to support a conviction. The Government called multiple medical professionals to indicate LL's cause of death was blunt force trauma, and LL had no reported accidental history to explain his injuries. Two medical experts who conducted post-mortem studies on LL convincingly concluded LL died from non-accidental trauma. The Government also introduced the following evidence wholly separate from the appellant's admissions on or after 19 October 2010: (1) LL only began to experience injuries upon the appellant's return from deployment; (2) The appellant was the caregiver for LL during each of his reported injuries, including the night of LL's death; (3) The appellant was specifically asked the night of LL's death whether LL had experienced any recent head trauma, and the appellant falsely denied any such incidents (including the reported fall two weeks earlier); and (4) LL would have had to experience a significant fall or the force equivalent to a car accident to sustain the injuries he did, and there was no history of any such accidents to explain these injuries.

The appellant was convicted because the medical evidence, his role as LL's caregiver during each injury, his false statements to medical personnel the night of LL's death, and the lack of any plausible accident account all pointed to his guilt. The demonstrated falseness of his account of the fall in the bathtub provided some further evidence of his guilt, but at most it had "only a slight effect on the resolution of the issues of the case." *Muirhead*, 51 M.J. at 97 (citing *Barnes*, 8 M.J. at 115-16). We therefore find no material prejudice to a substantial right of the appellant on this issue.[4]

---

[4] We recognize trial counsel asserted to the military judge in a hearing outside the presence of the members that "the accused's changing stories has [sic] been a critical part of this case and no side has claimed that it wasn't." However, the appellant's shifting account of the bathtub incident was merely one of three inconsistencies upon which the prosecution focused. The Government also highlighted that the appellant falsely told medical providers the night of LL's death that he had sustained no head injuries, and argued to the members that the appellant's account of LL's fall onto a television stand was not credible. However, trial counsel's representation as to the importance of evidence he was seeking to introduce does not control our determination as to the impact that evidence had on the members in findings. We also acknowledge trial counsel highlighted the appellant's shifting and false accounts of the alleged bathtub fall throughout his closing argument. However, trial counsel's argument is not evidence, and we are confident that absent the admission of the appellant's statements about the alleged bathtub incident, trial counsel would have had ample evidence to highlight in his closing argument.

*Defense Motion to Suppress Subsequent Statements to Investigators*

At trial, the defense also moved to suppress statements made to AFOSI agents in three interviews following rights advisement. These interviews took place on 12, 20 and 27 January 2011, after the appellant and his wife had moved to Little Rock AFB pursuant to a humanitarian reassignment. The basis for the motion was that AFOSI ignored the appellant's clear and unequivocal request for an attorney at the 12 January 2011 interview, and his statements at all three interviews were tainted by this violation.

Toward the outset of the interview on 12 January 2011, the AFOSI agent conducting the interview read the appellant his rights under Article 31, UCMJ, notifying the appellant that the agent suspected him of manslaughter, and advised the appellant of his rights. The following exchange then occurred:

AFOSI: Keith, do you understand your rights?

APPELLANT: [Affirmative response].

AFOSI: Do you want a lawyer?

APPELLANT: Right now -- I don't think I need one right now at this point.

AFOSI: Okay. All right. Yes or no, do you want a lawyer right now?

APPELLANT: Yes. I'm going to say yes.

AFOSI: I'm sorry?

APPELLANT: I'm going to say yes.

AFOSI: I'm sorry?

APPELLANT: Yes.

AFOSI: In other words, you want to speak to a lawyer today?

APPELLANT: Not today. I'm just saying if I need one I want one.

AFOSI: Okay. I'm with you big guy, I'm with you. But let me rephrase the question. Right now at 10:15 on Wednesday do you want a lawyer?

APPELLANT: No.

AFOSI: Okay. All right. Good are you willing to answer some questions for me?

APPELLANT: Yes.

The military judge denied the defense motion to suppress. He reviewed the video of the interview, and his written ruling states as follows:

> The video is critical to showing how quickly the events transpired. The video is also critical to demonstrate [the AFOSI agent] was clearly confused by the answers the accused was giving. This is based both on the testimony of [the AFOSI agent] and a close review of the video. In short, the video is the best evidence as to how the rights advisement transpired in this case.

The military judge concluded that "[i]t is apparent that in all the interviews, the [appellant] knowingly, intelligently, and voluntarily waived his rights and chose to speak with AFOSI."

Our resolution of the first issue renders it unnecessary to decide this issue, as we have already determined the admission of the appellant's statements from 19 October 2010 forward did not materially prejudice a substantial right of the appellant. However, we nonetheless find the military judge did not err in holding the appellant did not unambiguously invoke his right to counsel at the 12 January 2011 interview. If a suspect unambiguously invokes his or her right to counsel, law enforcement officials may not conduct any further questioning of the suspect about the offense unless they do so in a manner demonstrating they have "scrupulously honored" the suspect's invocation of rights. *Michigan v. Mosley*, 423 U.S. 96, 104 (1975). This rule serves the prophylactic purpose of preventing officers from badgering a suspect into waiving his previously asserted right to counsel. *Davis v. United States*, 512 U.S. 452, 458 (1994). In order to constitute an unambiguous invocation of the right to counsel, the invocation must be "sufficiently clear[] that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* at 459. In considering whether a reasonable investigator would consider the invocation unambiguous, reviewing courts may consider statements and events immediately preceding the invocation. *United States v. Delarosa*, 67 M.J. 318, 324 (C.A.A.F. 2009).

We find the appellant did not unambiguously invoke his right to counsel, despite the repeated "yes" answers to the question of whether he wanted an attorney. While normally a "yes" answer is unambiguous, immediately before the appellant gave this reply, he clearly indicated he did not want an attorney. The AFOSI investigator was

therefore allowed to seek clarification of the otherwise-unambiguous "yes" answer. A cold reading of the transcript suggests the investigator continued to press the issue after the appellant had clarified his election, but the video of the interrogation convincingly demonstrates otherwise. The entire exchange transcribed above took place in a matter of seconds, and there is no evidence the investigator was trying to badger the appellant into waiving his previously invoked rights. The investigator's follow-up questions did not attempt to lead the appellant into waiving his rights; in fact, one of the key follow-up questions suggested to the appellant that he did want an attorney. The totality of the circumstances indicates the appellant was merely attempting to preserve his right to speak to an attorney later if he determined he needed one; he plainly did not want to speak to an attorney at the time of the interview. The Supreme Court has stated "it will often be good police practice for the interviewing officers to clarify" an ambiguous response, as clarifying questions "help protect the rights of the suspect by ensuring that he gets an attorney if he wants one, and will minimize chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statement regarding counsel." *Davis*, 512 U.S. at 461. We are convinced the AFOSI investigator's questions were aimed at doing exactly this, and we see no error in the military judge's ruling in this regard.

*Legal and Factual Sufficiency*

The appellant alleges his convictions for Specification 2 of Charge I, Specification 2 of Charge II, and the Specification of the Additional Charge are legally and factually insufficient because the Government charged the appellant with failing to seek "appropriate medical care" but did not demonstrate what constituted "appropriate medical care." We specified a related issue for supplemental briefing: Whether the appellant's conviction on these specifications is legally and factually sufficient where the evidence at trial indicated the appellant sought medical care for LL but failed to fully inform medical personnel of LL's medical history. We grant relief on the specified issue.

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we] are [ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399.

The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *Turner*, 25 M.J. at 324 (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). Our assessment of factual and legal sufficiency is limited to the evidence presented at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

The specifications at issue all required the Government to prove beyond a reasonable doubt the appellant "failed to seek appropriate medical care" for LL. However, the evidence at trial indicates the appellant repeatedly sought medical assistance for his son, including the night of his death. The appellant brought LL to the base medical clinic several times, including after the injury reportedly sustained while combing LL's hair and after the reported accidents on 12 and 13 August 2010. On the night of LL's death, the appellant called 911 and performed cardiopulmonary resuscitation on LL until paramedics arrived. His fault was failing to inform medical personnel the night of LL's death about any head injury, not failing to seek appropriate medical care. The prosecution's strategy at trial confirms the Government's theory behind these specifications was that the appellant failed to inform medical providers the night of LL's death about any previous head injuries or incidents that would explain LL's medical emergency. Trial counsel represented the specifications were drafted to allow the Government the option of arguing the appellant was criminally responsible for failing to seek medical care after the reported fall in the bathtub the day before LL's death. However, at trial the prosecution convincingly demonstrated the fall did not cause LL's death, leaving their theory apparent: the appellant did not tell medical providers what he knew the night of LL's death.

The Government elected to charge the appellant with a specific act: failing to seek appropriate medical care for LL. It then focused its efforts on proving a different act: the appellant sought medical care for LL but did not offer the providers information that might have saved LL's life. "[A]n accused cannot be convicted of a crime different from that charged." *United States v. Wray*, 17 M.J. 375 (C.M.A. 1984) (citing *United States v. Lee*, 483 F.2d 959 (5th Cir. 1973)). The due process requirement of fair notice requires that an appellant has the "right to know what offense and *under what legal theory* he will be convicted." *United States v. Tunstall*, 72 M.J. 191, 196 (C.A.A.F. 2013) (emphasis in original) (citations and internal quotation marks omitted). As such, we find the appellant's convictions for Specification 2 of Charge I, Specification 2 of Charge II, and the Specification of the Additional Charge factually and legally insufficient.[5]

---

[5] We also note that the physician who treated LL the night of his death at the base medical clinic stated his treatment likely would have been the same even if the appellant had told providers about non-accidental trauma the appellant had inflicted upon LL.

The appellant asserts he is entitled to relief because the Government violated his due process right to timely post-trial processing of his case when 160 days elapsed after trial until the convening authority took action. The appellant's trial concluded on 18 May 2012. The record of trial was authenticated on 8 August 2012 (day 82 following trial), and the 1,286-page, 12-volume record was served on defense counsel on 20 August 2012 (day 94). The staff judge advocate's recommendation (SJAR) was served on defense counsel on day 98 and on the appellant on day 103. Civilian defense counsel requested an additional 20 days to complete a clemency submission.

The Government discovered sometime around this point Appellate Exhibit XXXI was missing from the record of trial. The nature of this missing exhibit is discussed more fully in our analysis of the next issue. On 28 August 2012, soon after the completion of the SJAR, the convening authority ordered a post-trial session under Article 39(a), UCMJ, "for the purpose of determining whether [the missing exhibit] can be found" or "otherwise to reconstruct the record to reflect the contents of that video exhibit." This post-trial session took place on 21 September 2012, and the military judge authenticated the newly-transcribed pages seven days later. Defense counsel then received the record of trial (including the post-trial session) on 2 October 2012, and on 9 October 2012 defense counsel received a requested seven-day extension to submit clemency matters. The appellant submitted voluminous clemency matters on 19 October 2012 (day 154), and the convening authority took action on 26 October 2012, 160 days following the conclusion of trial.

We review claims that an appellant was denied his due process right to speedy post-trial processing de novo. *United States v. Moreno*, 63 M.J. 129, 142 (C.A.A.F. 2006). In conducting this review, we assess the four factors laid out in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Moreno*, 63 M.J. at 135 (citing *United States v. Jones*, 61 M.J. 80, 83 (C.A.A.F. 2005)); *United States v. Toohey*, 60 M.J. 100, 102 (C.A.A.F. 2004). There is a presumption of unreasonable delay when the convening authority does not take action within 120 days of the completion of trial. *Id*. at 142. As the convening authority's action did not take place within 120 days of the completion of trial, the length of the delay is unreasonable on its face and we proceed to an analysis of the remaining three *Barker* factors.

(1) Reasons for the delay

This factor weighs in favor of the appellant. We recognize that this record of trial was lengthy and the record reveals the Government generally moved this case in a relatively timely manner following trial. The Government's failure to secure Appellate

Exhibit XXXI accounted for some of the delay in this matter, although it is not clear the Government would have obtained the convening authority's action within 120 days of the completion of trial without this issue. We also note that the post-trial Article 39(a), UCMJ, session revealed some confusion about whether the Government ever took physical possession of the appellate exhibit at issue, and trial defense counsel, citing his obligation to his client, affirmatively declined to produce a copy of the video or assist the Court in locating it.[6] Ultimately, however, it is the Government's responsibility to prepare the record of trial. Article 38(a), UCMJ, 10 U.S.C. § 838. Therefore, the fact that the missing exhibit delayed the completion of post-trial processing weighs in favor of the appellant.

(2) <u>The appellant's assertion of the right to timely review and appeal</u>

This factor weighs slightly in favor of the appellant. The appellant did not object to the delay in this matter until he submitted his matters in clemency, 154 days following the completion of his trial. Nonetheless, he did assert his right to timely post-trial processing at that time. "The obligation to ensure a timely review and action by the convening authority rests upon the Government and [the appellant] is not required to complain in order to receive timely convening authority action." *Moreno*, 63 M.J. at 138.

(3) <u>Prejudice</u>

In *Barker*, the Supreme Court recognized a framework to analyze the prejudice factor in a speedy trial context, and the *Moreno* Court adopted this framework in analyzing claims of prejudice arising from post-trial delay. *Moreno*, 63 M.J. at 140. Under this framework, we analyze whether the following interests of the appellant have been prejudiced: "(1) prevention of oppressive incarceration pending appeal; (2) minimization of anxiety and concern of those convicted awaiting the outcome of their appeals; and (3) limitation of the possibility that a convicted person's grounds for appeal, and his or her defenses in case of reversal and retrial, might be impaired." *Id.* at 147-48 (citations and internal quotation marks omitted).

Analyzing these sub-factors in the instant case, we find that the appellant has not articulated any prejudice he suffered as a result of the relatively minor delay in this aspect of processing his case. The appellant makes little effort before this Court to articulate prejudice, merely asserting that he has "multiple meritorious claims" before this Court and should the Court set aside his conviction, he will suffer oppressive incarceration in the interim. The *Moreno* Court explained that the oppressive incarceration pending appeal sub-factor "is directly related to the success or failure of an appellant's substantive appeal. If the substantive grounds for the appeal are not meritorious, an appellant is in no

---

[6] We decline to comment as to the propriety of defense counsel's actions in this regard. The record was not clear as to whether the missing Appellate Exhibit was still in the physical control of the defense counsel.

worse position due to the delay, even though it may have been excessive." *Moreno*, 63 M.J. at 139 (citations omitted). While we find some merit in some of the appellant's assigned errors, we ultimately reassess the sentence below to cure any such prejudice. Beyond this, the appellant has articulated no prejudice. We find that the utter lack of any articulated prejudice weighs heavily against the appellant, and ultimately dictates that the appellant is not entitled to relief. We are also mindful of our authority to grant relief under *United States v. Tardif*, 57 M.J. 219 (C.A.A.F. 2002) and Article 66(c), UCMJ, 10 U.S.C. § 866(c), even in the absence of prejudice. We decline to do so here.

*Record of Trial Completeness*

The defense played a series of short videos for the members in sentencing proceedings of the appellant playing with his son, in an apparent attempt to portray the appellant as a loving father. However, the Government misplaced all of the videos except for one after trial and they are not included in the record of trial. When the military judge was made aware of this issue, he ordered a post-trial Article 39(a), UCMJ, session to reconstruct the missing videos to the best extent possible. During this session, defense counsel had little recollection of the videos' contents. The military judge stated that the videos' titles generally described their contents and were what one "would expect of a father and his child interacting." The military judge described that the videos generally lasted two to three minutes each except for one that was 14 minutes long, and that they contained "[n]o conversations, no statements, no testimony, just videos." Trial counsel also generally described the videos' content for the record.

Whether a record of trial is complete is an issue we review de novo. *United States v. Henry*, 53 M.J. 108, 110 (C.A.A.F. 2000).

Article 54(c)(1), UCMJ, 10 U.S.C. § 854(c)(1), requires a "complete" record of the proceedings and testimony to be prepared for any general court-martial resulting in a punitive discharge. A "complete" record must include the exhibits that were received in evidence, along with any appellate exhibits. Rule for Courts-Martial (R.C.M.) 1103(b)(2)(D)(v).

Failure to comply with this rule "does not necessarily require reversal. Rather, an incomplete or non-verbatim record . . . raises a presumption of prejudice which the Government may rebut." *United States v. Abrams*, 50 M.J. 361, 363 (C.A.A.F. 1999) (quoting *Drafter's Analysis, Manual for Courts-Martial, United States*, A21-77 (1998 ed.)). Where a record is missing an exhibit, this Court evaluates whether the omission is substantial. *Henry*, 53 M.J. at 111. "Insubstantial omissions from a record of trial do not raise a presumption of prejudice or affect that record's characterization as a complete one." *Id.* If the omission is substantial, thereby raising a presumption of prejudice, the Government may rebut the presumption by reconstructing the missing material. *See United States v. Lashley*, 14 M.J. 7, 9 (C.M.A. 1982) (holding that military

judge's reconstruction of unrecorded portions of a witness's testimony rendered the record "substantially verbatim"); *United States v. Garries*, 19 M.J. 845, 852 (A.F.C.M.R. 1985) (finding that where court recording equipment malfunction for approximately five minutes and the military judge promptly directed reconstruction of the unrecorded testimony, the record was rendered substantially verbatim and even assuming a presumption of prejudice arose, the Government rebutted the presumption through the reconstructed testimony); *but see United States v. Snethen*, 62 M.J. 579, 581 (A.F. Ct. Crim. App. 2005) (holding that where at least an hour of witness testimony and argument in motions practice went unrecorded, a military judge's reconstruction of the missing witness testimony in question and answer format was insufficient to overcome the presumption of prejudice, because of the importance of the lost testimony and arguments, the lengthy duration of the unrecorded portion of the proceedings, and the length of time between trial and reconstruction efforts).

In addition, our superior Court has recently held that R.C.M. 1103 is of limited applicability in situations where the transcript is verbatim but the record is otherwise incomplete prior to the appellant's clemency submission because a defense sentencing exhibit was missing. *United States v. Gaskins*, 72 M.J. 225, 230 (C.A.A.F. 2013). In such situations, the sentencing limits of Article 54(c)(1)(A), UCMJ, do not limit the ability of this Court to remedy any such error. *Id*.

We find that the absence of the actual videos does not render the record of trial incomplete, and we see no prejudice to the appellant. The missing videos relate only to sentencing, not findings, and it is difficult to imagine a scenario where this Court's review would be affected by the absence of such videos in a case where the appellant stands properly convicted of killing his son. The description of the videos gives this Court an adequate feel of their content and our review presumes that the videos portray the appellant as a kind, loving father who interacted well with LL. In addition, Appellate Exhibit XXXII contains one of the videos the appellant played in his unsworn statement, and this gives the Court a sense of the videos' themes. It is also worth noting that trial defense counsel did not mention the videos in his sentencing argument and had "no recollection" of their content by the time of the post-trial Article 39(a), UCMJ, session, indicating they had little impact at trial. We find no error materially prejudicial to a substantial right of the appellant on this issue.

*Ineffective Assistance of Counsel*

The appellant alleges his trial defense counsel was ineffective by conceding the appellant's guilt in his sentencing argument. We disagree.

We review claims of ineffective assistance of counsel de novo, applying the two-pronged test the Supreme Court set forth in *Strickland v. Washington*, 466 U.S. 668, 687

(1984). *See United States v. Tippit*, 65 M.J. 69, 76 (C.A.A.F. 2007). Under *Strickland*, an appellant must demonstrate:

> (1) a deficiency in counsel's performance that is "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"; and (2) that the deficient performance prejudiced the defense through errors "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."

*Tippit*, 65 M.J. at 76 (quoting *United States v. Moulton*, 47 M.J. 227, 229 (C.A.A.F. 1997) (quoting *Strickland*, 466 U.S. at 687))). When an appellant alleges ineffective assistance of counsel, he "must surmount a very high hurdle." *Id.* (citations omitted). The deficiency prong requires that an appellant show that the performance of counsel fell below an objective standard of reasonableness, according to the prevailing standards of the profession. *Strickland*, 466 U.S. at 688. The prejudice prong requires a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

In his sentencing argument, the appellant's civilian defense counsel advocated that the members should not impose a dishonorable discharge and confinement for 20 years (the sentence urged by trial counsel), because the appellant was already living with a worse punishment:

> It's living with the thought that you killed your child. . . . [The appellant's] going to have to live with it. . . . I think as just members of the human race, all we can really do is hope and pray that he comes to peace with himself, he comes to peace with his wife, and he comes to peace with God, because ultimately, that is all we can hope for.

He concluded his argument by advising the members, "there is nothing you can do to him worse than living."

"[I]n general, when an accused has consistently denied guilt, a functional defense counsel should not concede an accused's guilt during sentencing." *United States v. Wean*, 45 M.J. 461, 464 (C.A.A.F. 1997). Contrary to the appellant's assertion, we find the appellant's civilian defense counsel did not concede the appellant's guilt in his sentencing argument. The appellant repeatedly told investigators that he believed LL's death was his fault, even if it was an accident. His unsworn statement advised the members that "there's no greater punishment than losing [LL]," that "I have to live with that," and that "[n]one of you have to bear that cross." Civilian defense counsel's argument merely acknowledged that the appellant killed LL; it did not assert that the appellant did so intentionally or negligently. This sentencing argument is perfectly

consistent with the defense theory that LL died from an accident under the appellant's care. As the appellant himself expressed, an accident would naturally lead to feelings of guilt and responsibility. Even assuming some deficiency in civilian defense counsel's argument, this argument did not fall below an objective standard of reasonableness, as it was a moving plea for leniency and it convinced the members to adjudge a sentence of about one-third the confinement time urged by the Government. The appellant has not met "very high hurdle" of demonstrating ineffective assistance of counsel.

*Sentencing Instructions*

During his sentencing instructions, the military judge advised the members as follows:

> As I've already indicated, this court may sentence the accused to confinement for a maximum of 20 years. A sentence to confinement should be adjudged in either full days, full months, or full years. Fractions, such as one-half or one-third should not be employed. So, for example, if you do adjudge confinement for a month-and-a-half should instead be expressed as confinement for 45 days; or confinement for one-and-one-half years should instead be expressed as confinement for 18 months. This example should not be taken as a suggestion, only an illustration of how to properly announce your sentence.

This instruction drew no objection from counsel for the Government or the appellant.

The propriety of a trial judge's instruction is a question of law we review de novo. *United States v. Ober*, 66 M.J. 393, 405 (C.A.A.F. 2008) (citations omitted). However, failure to object to an instruction given waives the objection absent plain error. *United States v. Pope*, 69 M.J. 328, 333 (C.A.A.F. 2011); R.C.M. 920(f).

The appellant alleges this portion of the military judge's sentencing instruction suggested the appellant could receive a sentence to confinement of over one year of confinement. Under any standard of review, this allegation is meritless. The military judge merely provided examples of how to properly express a term of confinement. One example was for just 45 days of confinement. He properly advised the members these examples were illustrative only. Members are presumed to follow the instructions given by the military judge. *United States v. Custis*, 65 M.J. 366, 372 (C.A.A.F. 2007). There is no indication the members did not follow the military judge's instruction that this example was illustrative only. In fact, the members adjudged a sentence that was far different from either of the examples the military judge provided, clearly evincing that they understood the illustrative nature of these examples. The military judge committed no error, let alone plain error, in this matter.

*Decision to Not Merge Charges and Specifications*

As the sentencing phase of trial commenced, trial defense counsel moved the military judge to merge the charges for sentencing purposes. The military judge responded by combining the two specifications alleging the appellant killed LL by blunt force trauma and rotational force injuries into one charge of involuntary manslaughter, and combining the three specifications alleging the appellant failed to seek appropriate medical care for LL into another charge of involuntary manslaughter for sentencing purposes. Trial defense counsel, however, alleged that the specifications should be further combined into one charge of involuntary manslaughter for sentencing purposes, resulting in a maximum sentence to confinement of 10 years instead of the 20 years maximum sentence the military judge's solution offered. The appellant now alleges the military judge abused his discretion by denying the motion to further merge the charges and specifications for sentencing purposes.

Our decision to find the specifications alleging the appellant failed to seek appropriate medical care for LL legally and factually insufficient renders this issue moot on appeal. In reassessing the appellant's sentence, we will consider the fact that he should have faced a maximum sentence to confinement of 10 years.[7]

*Deposition of Civilian Doctor*

The appellant next alleges the military judge erred in ordering the deposition of Dr. YW, the Japanese physician who treated LL at the off-base hospital up to the point that LL died. Dr. YW testified at the Article 32, UCMJ, hearing in this matter, and was originally scheduled to testify at trial. However, the trial was delayed due to an expert witness's availability, and the military judge then ordered Dr. YW deposed, reasoning that as a foreign citizen, Dr. YW could not be compelled to travel to the Air Force base in Japan to testify. Trial defense counsel objected to the deposition order because he did not have access to his expert witness. However, at trial the defense did not object to the admission of the deposition. The appellant now alleges the military judge abused his discretion because he failed to articulate a reason for determining Dr. YW was unavailable, and because the military judge failed to ensure the appellant had the benefit of his expert witness's participation in developing a cross-examination of Dr. YW.

A military judge's determination of a witness's unavailability, including the antecedent question of the Government's good-faith efforts to locate and present the witness, is reviewed for an abuse of discretion. *United States v. Cabrera-Frattini*,

---

[7] The appellant does not allege that the military judge erred in failing to find multiplicious for findings the appellant's convictions for involuntary manslaughter and negligent homicide by causing blunt force trauma and rotational force injuries. Likewise, we do not find them multiplicious in findings, because each provision requires proof of a fact which the other does not. *Blockburger v. United States*, 284 U.S. 299, 304 (1932).

65 M.J. 241, 245 (C.A.A.F. 2007) (citations omitted). Under this standard, the military judge's findings of fact are reviewed for an abuse of discretion and conclusions of law are reviewed de novo. *Id.* "So long as the military judge understood and applied the correct law, and the factual findings are not clearly erroneous, neither the military judge's decision to admit evidence, nor his unavailability ruling, should be overturned." *Id.* (citing *United States v. McDonald*, 59 M.J. 426, 430 (C.A.A.F. 2004)). Failure to object to the introduction of evidence at trial waives appellate review of the issue absent a showing of plain error. *United States v. Eslinger*, 70 M.J. 193, 197-98 (C.A.A.F. 2011) (citing *United States v. Kasper*, 58 M.J. 314, 318 (C.A.A.F. 2003)). To gain relief under a plain error analysis, the appellant has the burden to demonstrate that: "(1) there was error; (2) the error was plain or obvious; and (3) the error materially prejudiced a substantial right of the accused." *United States v. Humphries*, 71 M.J. 209, 214 (C.A.A.F. 2012) (citations omitted).

"A deposition may be ordered whenever, after preferral of charges, due to exceptional circumstances of the case it is in the interest of justice that the testimony of a prospective witness be taken and preserved for use at an investigation under Article 32 [, UCMJ,] or a court-martial." R.C.M. 702(a). A deposition may be taken to preserve the testimony of a witness who is likely to be unavailable at the Article 32, UCMJ, investigation or at trial. R.C.M. 702(a), Discussion. After referral, either the convening authority or the military judge may order a deposition be taken on request of a party. R.C.M. 702(b). "A request for a deposition may be denied only for good cause." R.C.M. 703(c)(3)(A). The discussion to this rule states:

> Good cause for denial includes failure to state a proper ground for taking a deposition; failure to show the probable relevance of the witness' testimony, or that the witness' testimony would be unnecessary. The fact that the witness is or will be available for trial is good cause for denial in the absence of unusual circumstances, such as improper denial of a witness request at an Article 32[, UCMJ,] hearing, unavailability of an essential witness at an Article 32[, UCMJ,] hearing, or when the Government has improperly impeded defense access to a witness."

R.C.M. 703(c)(3)(A), Discussion.

Our superior court has defined "unavailability" in terms of the hearsay prohibition of Mil. R. Evid. 804(b)(1) and the Confrontation Clause of the Sixth Amendment.[8] *United States v. Vanderwier*, 25 M.J. 263, 265 (C.M.A. 1987) (citations omitted). Before a witness is considered "unavailable" for Sixth Amendment purposes, "the government must first make a 'good faith' effort to secure the witness's presence at trial." *Cabrera-Frattini*, 65 M.J. at 245 (citing *Barber v. Page*, 390 U.S. 719, 724-25 (1968)). The Court

---

[8] U.S. CONST. amend. VI.

evaluates whether the Government has made such a good faith effort under a reasonableness standard, considering all the circumstances rather than a per se rule. *Id.* (citations omitted). In making this determination, "there is no bright-line rule which will fit every situation"; rather, the military judge "must carefully weigh all facts and circumstances of the case, keeping in mind the preference for live testimony." *United States v. Cokeley*, 22 M.J. 225, 228 (C.M.A. 1986). Considerations the military judge should consider include: "the importance of the testimony, the amount of delay necessary to obtain the in-court testimony, the trustworthiness of the alternative to live testimony, the nature and extent of the earlier cross-examination, the prompt administration of justice, and any special circumstances militating for or against delay." *Id.*

The military judge ordered Dr. YW's deposition because Dr. YW, as a private Japanese citizen not affiliated with the military, could not be compelled to travel to testify at the appellant's court-martial. At trial, defense counsel never objected to the admission of Dr. YW's deposition. The Government argues the plain error standard applies because no objection was lodged at trial; the appellant counters that his initial objection to the ordering of the deposition preserved the issue for our full review. We hold the plain error standard of review is proper. The military judge's act of ordering a deposition is a preventive measure designed to ensure evidence is preserved for use at trial. However, the deposition does not become admissible in evidence until at trial, the military judge finds the declarant is unavailable. Mil. R. Evid. 804(b)(1). The accused is not affected until the deposition (or portions thereof) is introduced into evidence without the presence of the live witness. Here, when the appellant's interest in objecting was greatest, no such objection came. Instead, defense counsel affirmatively represented that the Government and defense had agreed to introduce portions of the deposition. Therefore, we review this matter for plain error.

We find no such plain error in the admission of the deposition. Defense counsel objected to the deposition as it began, reasoning that defense counsel did not have access to their expert consultants and witnesses to aid the defense in cross-examining Dr. YW. At trial, the military judge noted that Dr. YW "is not going to appear at trial," and that the parties had agreed to what portions of the deposition would be introduced into evidence. Defense counsel's objection at the deposition was not raised to the military judge, and in fact defense counsel affirmatively agreed to introduce portions of the deposition to the members. While the military judge did not further detail his rationale for finding Dr. YW was unavailable, and the record does not demonstrate any efforts the Government made to secure his appearance at trial, it was defense counsel's failure to object that prevented the record from being fully developed in this area. The military judge's stated rationale that Dr. YW could not be compelled to travel to the court-martial is legally correct, and we find no plain error in his deposition order.[9]

---

[9] Even if we were to review the military judge's decision to order the deposition under an abuse of discretion standard, we would reach the same conclusion. The military judge's findings of fact in ordering the deposition were limited, but they were not clearly erroneous. He made no error in law, and his decision to order a deposition falls

*Sentence Reassessment*

Having found the appellant's convictions for Specification 2 of Charge I, Specification 2 of Charge II, and the Specification of the Additional Charge factually and legally insufficient, we must consider whether we can reassess the sentence or whether this case should be returned for a sentence rehearing. We are confident we can accurately reassess the appellant's sentence, despite the fact that the findings have been significantly altered and the fact that this case involved members.

This Court has "broad discretion" in deciding to reassess a sentence to cure error and in arriving at the reassessed sentence. *United States v. Winckelmann*, 73 M.J. 11, 12 (C.A.A.F. 2013). Our superior court has recently observed that judges of the Courts of Criminal Appeals can modify sentences "'more expeditiously, more intelligently, and more fairly' than a new court-martial." *Id.* at 15 (quoting *Jackson v. Taylor*, 353 U.S. 569, 580 (1957)). Based on the totality of circumstances in this case, we find we may reassess the sentence, thereby curing any prejudicial effect of the factually and legally insufficient specifications in this case.

Pursuant to *Winckelmann*, four factors guide our analysis in determining we can confidently reassess the sentence in this matter:

1) <u>Dramatic changes in the penalty landscape and exposure:</u> As a result of our finding that the three specifications alleging the appellant failed to seek appropriate medical care are factually and legally insufficient, the maximum possible sentence to confinement is reduced to 10 years from the 20 years upon which the members were instructed. This is a significant change in the penalty landscape, although the maximum possible sentence to confinement under our findings remains three years above the sentence the members imposed.

2) <u>Whether an appellant chose sentencing by members or a military judge alone:</u> The appellant was sentenced by officer and enlisted members. We acknowledge that our certainty as to what would have been done absent the error is reduced in this situation, but this factor is not dispositive.

3) <u>Whether the nature of the remaining offenses captures the gravamen of criminal conduct included within the original offenses and, in related manner, whether significant or aggravating circumstances addressed at the court-martial remain admissible and relevant to the remaining offenses:</u> This factor indicates we may confidently reassess the appellant's sentence. The appellant still stands properly convicted of involuntary manslaughter concerning his son who had barely turned

within the range of choices available to him, particularly because a request to order a deposition will not normally be denied absent good cause.

one year old. The fact that he killed his son through blunt force trauma and rotational force injuries to the head is the gravamen of the appellant's misconduct. The failure to fully inform medical personnel of LL's medical history or how he might have sustained his injuries is a secondary matter that only arose as a result of the appellant's fatal abuse of his son. Even had the appellant been found not guilty of the three specifications alleging failure to seek adequate medical care for LL, the Government was perfectly free to introduce evidence of the appellant's lies and omissions to medical personnel in findings and sentencing. This factor strongly weighs in favor of our ability to reassess the appellant's sentence.

4) Whether the remaining offenses are of the type that judges of the courts of criminal appeals should have the experience and familiarity with to reliably determine what sentence would have been imposed at trial: This Court collectively has ample experience with these types of charges and cases with similar facts. Our experience informs us that we are able to reliably determine what sentence would have been imposed at trial.

Therefore, under the unique facts of this case and considering the totality of the circumstances, we find we are able to "determine to [our] satisfaction that, absent any error, the sentence adjudged would have been of at least a certain severity." *United States v. Sales*, 22 M.J. 305, 308 (C.M.A. 1986). Having so found, we reassess the appellant's sentence to the sentence that was adjudged at trial: a dishonorable discharge, confinement for 7 years, and reduction to E-1. Our review of the record and our experience with such proceedings convinces us that the appellant was sentenced for killing LL by force, not for any lies or omissions to medical personnel the night of LL's death. This is especially true when the physician who treated LL at the base medical clinic that night testified that he would not have provided any different treatment had the appellant told him LL had suffered head injuries. We are certain the members would have imposed the same sentence even had the maximum imposable sentence to confinement been 10 years instead of the 20 years the members were advised at trial. We therefore reassess the sentence to the sentence adjudged at trial.

*Conclusion*

The findings of guilty as to Specification 2 of Charge I, Specification 2 of Charge II, and the Additional Charge and its Specification are set aside and dismissed as factually and legally insufficient. The remaining findings, and the sentence, as reassessed, are correct in law and fact, and no error materially prejudicial to the substantial rights of the appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c); *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000).

Accordingly, the findings, as modified, and the sentence, as reassessed, are

AFFIRMED.

FOR THE COURT

LEAH M. CALAHAN
Deputy Clerk of the Court

ACM 38215