# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39538**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Charles D. BUFORD, Jr.**
Staff Sergeant (E-5), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 9 March 2020

————————————

*Military Judge:* L. Martin Powell.

*Approved sentence:* Dishonorable discharge, confinement for 5 months and 1 day, total forfeiture of pay and allowances, reduction to E-1, and a reprimand. Sentence adjudged 12 May 2018 by GCM convened at Yokota Air Base, Japan.

*For Appellant:* Captain David A. Schiavone, USAF.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Major Anne M. Delmare, USAF; Mary Ellen Payne, Esquire.

Before J. JOHNSON, POSCH, and KEY, *Appellate Military Judges*.

Judge KEY delivered the opinion of the court, in which Chief Judge J. JOHNSON and Judge POSCH joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

KEY, Judge:

A general court-martial composed of officer members convicted Appellant, contrary to his pleas, of one specification of receiving child pornography in violation of Article 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C.

§ 934.[1,2] The court-martial sentenced Appellant to a dishonorable discharge, confinement for six months, total forfeiture of pay and allowances, reduction to the grade of E-1, and a reprimand. The convening authority reduced the confinement to five months and one day, but otherwise approved the sentence as adjudged.

On appeal, Appellant raises four issues through counsel: (1) whether the evidence was legally and factually sufficient to support his conviction; (2) whether the military judge erred by admitting videos of child pornography which were not found on Appellant's computer; (3) whether the military judge erred by not providing the court members a definition of "receiving;" and (4) whether the transcript is not verbatim. Appellant personally raises two additional issues: (5) whether the court-martial had jurisdiction over him; and (6) whether he was subjected to illegal pretrial punishment in violation of Article 13, UCMJ, 10 U.S.C. § 813.[3] Finding no error prejudicial to the substantial rights of Appellant, we affirm.

## I. BACKGROUND

Appellant was charged with knowing receipt via the Internet of two videos containing child pornography. These videos, however, were never found on any electronic devices or storage media seized from Appellant. At trial, the Government admitted and played two videos retrieved from law enforcement archives, asserting Appellant had downloaded the same videos from some other source. The Government's case against Appellant focused on evidence indicating he had used peer-to-peer networking software to download the videos; the members convicted Appellant of receiving only one of the videos.

Appellant came to the attention of military law enforcement in the summer of 2014 when an Okinawa-based Naval Criminal Investigative Service (NCIS) agent, Special Agent WV, identified an Internet Protocol (IP) address

---

[1] Except as otherwise noted, all references in this opinion to the Uniform Code of Military Justice (UCMJ) and Rules for Courts-Martial (R.C.M.) are to the *Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*).

[2] The members convicted Appellant by excepting out certain language from the specification and acquitted him of a separate specification of possessing child pornography, which we will discuss in this opinion.

[3] Appellant personally asserts these two issues pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

associated with a military installation in Japan that appeared to be either transmitting or receiving child pornography via peer-to-peer networking.[4]

According to expert testimony elicited by the Government at trial, peer-to-peer networking allows users to share files with each other by creating a network of the users' computers. Unlike a server-based network, the files reside on the individual users' computers ("host" computers), not on centralized servers. In order for a user to be part of a peer-to-peer network, the user must first install peer-to-peer networking software which facilitates access to the network. A user on the network interested in downloading files would then look for the desired files—typically done by utilizing a search function built into the software, specifying key words for the software to seek out on the network. The software will return a list of relevant files found on the network, and the user can then choose which files to download to his or her computer.

To increase the efficiency of the network, peer-to-peer software often downloads segments of a requested file from a number of different hosts on the network, then assembles those segments into a completed file on the requesting computer. In order for this process to work, the network software creates a unique identifier known as a "hash value" for each file on the network. Sometimes referred to as "digital fingerprints," hash values are derived from mathematical processes based upon the data within a particular file, unrelated to file identifiers such as filenames and extensions.[5] Unique hash values are critical for the operation of peer-to-peer networks, as the network software must use identical files in order to be able to download file segments from multiple sources at once and then correctly compile those segments into a working file.

When a user installs peer-to-peer networking software on his or her computer, the software creates an empty folder for shared files. The folder is typically visible to other network users and serves dual purposes. The first is as a repository for the user's files which are available to others on the network to download. The second is as a destination for the files the user has requested to be downloaded. Users have the ability to move files in and out of their shared folder at their discretion. The default setting for most peer-to-peer

---

[4] Appellant's trial originally commenced in January 2016, but for reasons not pertinent here, those charges were dismissed, and new charges were preferred in the latter half of 2017.

[5] In this case, one of the Government's expert witnesses testified that hash values are "[t]rillions of times more accurate than DNA" in identifying unique files.

programs is to make files in the shared folder available to be downloaded by other users on the network. Thus, when a user downloads a file using the network software, the file will typically be hosted on that user's computer for others to find and download until the user removes the file from the shared folder.

Special Agent WV was alerted to the activity involving the IP address in Japan by using automated software that scans peer-to-peer networks by periodically searching for terms associated with child pornography. Once the software finds a computer hosting files with filenames indicative of child pornography, the software executes a "browse-host" command, which displays the files in that host computer's shared folder. The software logs information about the shared folder's files in a database, including: the IP address associated with the computer where the files were found, the files' names, their hash values, and the percentage of the files on the host computer at the time the browse-host command is executed.

Government expert-witness testimony further established that in local-network configurations, such as home networks in which computers connect to the Internet through a router, Internet service providers assign IP addresses to users' routers, and computers or other devices connected to a given router make use of that router's IP address. The IP address does not indicate which device or devices are connected to the router nor identify any particular connected device.

After being alerted to the apparently illicit Internet activity, Special Agent WV generated a spreadsheet of the results of the browse-host commands directed at the computer connected to the router with the Japan IP address. The spreadsheet showed a number of files in various states of download over a seven-day period from 22 June 2014 to 29 June 2014. For example, on 22 June 2014, at 2045 hours,[6] the system located 40 files in this computer's shared folder with download percentages ranging from 0.14 percent to 100 percent. At 2308 hours the same day, only eight files were in the folder, ranging from 0.15 percent to 99.14 percent. Virtually all the files on the spreadsheet had filenames describing or suggesting sexual conduct involving

---

[6] The system reported times in Coordinated Universal Time (UTC), which was nine hours behind Yokota Air Base, where Appellant was tried.

children. Special Agent WV tried to download a file directly from the computer using the Japan IP address, but was unable to do so.[7]

Of the files on the spreadsheet, Special Agent WV focused on two video files. The first file had a hash value beginning with the characters "SDHI" and the second had a value beginning with "QAQX." The QAQX file first appeared on the spreadsheet as a result of a browse-host command executed on 22 June 2014 at 0725 hours. At that point, the file showed as 6.22 percent downloaded, but it later appeared at 2045 hours the same day at 100 percent. The filename associated with the QAQX file was 124 characters long (including spaces) plus a 7-character extension and included sexually explicit terms, words indicative of child pornography, and four first names followed by ages ranging from 4 to 8 years old. The SDHI file—also explicitly named—appeared in the 0725 hours search at 0.06 percent, then again at 2045 hours at 92.56 percent. The SDHI file never appeared at 100 percent on the spreadsheet.

Special Agent WV recognized the QAQX hash value from another case he had investigated as being associated with a video of child pornography, a copy of which was stored in NCIS's local repository of child-pornography evidence. He subsequently determined the SDHI hash value on the spreadsheet matched the hash value of another video in the NCIS repository.

Armed with this information, Special Agent WV obtained a summons requiring the Internet service provider to divulge the account information for the IP address during the time period in question. In response to the summons, the provider disclosed the IP address had been assigned to Appellant, leading the investigation to be transferred to Air Force investigators due to Appellant's status as an Airman. Special Agent WV passed on not just his spreadsheet, but also copies of the videos with the QAQX and SDHI hash values he had copied from NCIS's repository. These two videos ultimately became the basis for the specification alleging Appellant's receipt of child pornography.

Pursuant to a search authorization, Air Force Office of Special Investigations agents searched Appellant's military dormitory room and seized a laptop computer and multiple electronic devices along with digital storage media. There was no evidence Appellant shared his dormitory room or that anyone else had access to it. Appellant had a wireless router in his room, and his

---

[7] He hypothesized the computer may have been offline or was no longer sharing files; alternatively, the Internet provider may have assigned a new IP address to the router.

password-protected laptop was plugged directly into it. Agents did not seize the router or check to see if it required a password to wirelessly connect to it or to access the Internet. Agents sent the seized electronic items to the Defense Cyber Crime Center's Defense Cyber Forensics Lab for analysis by a contractor, Mr. BW, whose examination of Appellant's laptop found peer-to-peer software installed on it. The software had been run 14 times between 22 June and 30 June 2014.

About 18 thumbnail-sized images of what appeared to be child pornography were also found on the computer in a deleted temporary ("temp") file. Mr. BW explained that temp files are created automatically by computer applications for the purpose of temporarily storing data which facilitates the running of those applications, and users cannot access data stored in the files without specialized software. The temp file with the images in it was created on 16 April 2014, and the last time data was written to it was on 22 June 2014. In addition to the 18 thumbnail-sized images, the file contained between 600 and 900 other non-contraband images. Although the folder containing the temp file had been deleted, Mr. BW was able to recover the temp file using forensic software. He was not able to determine what application on Appellant's computer created the temp file, what applications interacted with the temp file, or how the temp file was being used. The 18 thumbnail-sized images became the basis for the specification alleging Appellant's possession of child pornography which he was later acquitted of.

Mr. BW also conducted keyword searches on a copy of the hard drive from Appellant's computer, finding references to a number of files with terms indicative of child pornography in their names. Other than the thumbnail images in the temp file, however, Mr. BW was unable to locate any child pornography on Appellant's computer. He did not find either the QAQX or SDHI videos or any of the other files from the peer-to-peer spreadsheet on the computer.

Mr. BW did note that file-shredding software had been installed on Appellant's computer, which can be used to more thoroughly remove files from a hard drive than simply executing delete commands. The Government hypothesized Appellant may have used the software to erase child pornography files he had downloaded. Mr. BW determined the file-shredding software had been run three times between 18 and 29 June 2014, but he could not say which files, if any, had actually been "shredded."

Mr. BW found a number of "jump list entries" and "linked" files, which are items of code created when computer files are opened. Both jump list entries and linked files assist the computer in quickly opening target files. Jump list entries are essentially lists of files recently opened by a particular application, while the linked files act as shortcuts, telling the computer which appli-

cation to use to open a particular target file (*i.e.*, they link the particular file to the appropriate application). Mr. BW identified jump list entries and linked files referencing target files which had child-pornography-related terms in their names, but he was not able to find those target files on Appellant's computer. Nine of these target files had the same names as files on the peer-to-peer spreadsheet, suggesting the files had been both downloaded to Appellant's laptop from the peer-to-peer network via Appellant's router as well as accessed while they resided on Appellant's laptop. The jump list entries had been created in January, April, and June of 2014. Because Mr. BW only found the jump list entries and linked files—which contain filenames, not the target files themselves—he could not say what was actually in those target files, much less conclude that they were images of child pornography, in spite of their explicit names.

One of the linked files Mr. BW found contained the same filename as the one given to the file on the spreadsheet with the QAQX hash value.[8] The linked file had been created on 24 June 2014 at 1345 hours, Coordinated Universal Time (UTC), which indicated that target file had been opened by a program of some sort on Appellant's computer. From this linked file, Mr. BW further determined the target file had been originally put on Appellant's computer on 22 June 2014 at 0653 hours, half an hour before a file with the same name showed on the spreadsheet as 6.22 percent downloaded. Mr. BW was unable to locate any linked files associated with the filename given to the SDHI file.

In addition to the above, Mr. BW found two files with names indicative of child pornography in the laptop's recycling bin, indicating they had been deleted by the user in February 2014. He also found evidence on Appellant's computer of a user searching for a keyword related to child pornography on both Google Images and on a website that assists in locating files on peer-to-peer networks. The peer-to-peer search had been conducted for the same keyword 30 times, the last time being on 2 June 2014; the Google Images search was only conducted once on an unknown date. Mr. BW found indications that other keywords indicative of child pornography had been input by a user as search terms within the peer-to-peer program itself. He could not, however, say what results, if any, were returned for any of the searches.

Mr. BW testified there was no way to know what search terms had been used to find the files Appellant was accused of downloading. He further testified that—because he did not find either the QAQX or SDHI videos on Appel-

---

[8] Only filenames, not hash values, were found on Appellant's laptop.

lant's computer—there was no way of knowing if the files as they existed on the laptop were corrupt or otherwise non-playable.

At trial, Appellant stipulated that the videos retrieved from the NCIS repository with the QAQX and SDHI hash values contained child pornography. Nonetheless, trial counsel sought to show the videos—the QAQX video was about 21 minutes in length—in their entirety to the members. The military judge only allowed trial counsel to show the members 30 seconds of each video over the Defense's objection that the stipulation obviated the need to show the videos at all.

The members acquitted Appellant of possessing the 18 thumbnail-sized images found in the temp file. They convicted Appellant of receiving the QAQX video, but not the SDHI video, which they excepted from the specification.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

Appellant argues the evidence is legally and factually insufficient to support his conviction based upon a lack of proof that he actually received the QAQX video, the sole item of child pornography he was convicted of receiving.

#### 1. Law

We may affirm only those findings of guilty that we determine are correct in law and fact and, on the basis of the entire record, should be approved. Article 66(c), UCMJ, 10 U.S.C. § 866(c). We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). Circumstantial evidence may suffice. *See United States v. Kearns*, 73 M.J. 177, 182 (C.A.A.F. 2014) (citing *United States v. Blocker*, 32 M.J. 281, 285 (C.M.A. 1991)). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in

favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (2019) (alteration in original) (quoting *United States v. Navrestad*, 66 M.J. 262, 269 (C.A.A.F. 2008) (Effron, C.J., joined by Stucky, J., dissenting)), *cert. denied*, __ U.S. __, 139 S. Ct. 1641 (2019).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399).

### 2. Analysis

Appellant was convicted of a single specification of receiving child pornography, which required the Government to prove beyond a reasonable doubt: (1) that Appellant knowingly and wrongfully received child pornography, and (2) that, under the circumstances, Appellant's conduct was of a nature to bring discredit upon the armed forces. *See Manual for Courts-Martial, United States*, pt. IV, ¶ 68b.b.(1) (2012 ed.) (2012 *MCM*).

At trial, Appellant stipulated to the contents of the video with the QAQX hash value retrieved from NCIS's child-pornography repository. The stipulation explicitly described sexual conduct between children and an adult that meets the definition of child pornography.

The evidence supporting Appellant's *receipt* of the QAQX video is somewhat more complex. On 22 June 2014, a computer connected to Appellant's wireless router downloaded a file with the QAQX hash value via peer-to-peer networking software to a shared folder visible to other network users such that the file appeared to have been 100 percent downloaded. The file with the QAQX hash value had a 124-character-long filename describing sexual conduct involving children, including names and ages. On 24 June 2014, two days after the file was downloaded, a linked file was created on Appellant's computer referencing the same 124-character filename, indicating that file had been opened by a program on the computer.

Testimony at trial established that the computer seized from Appellant's room was password-protected, had been used to access social media and email accounts belonging to Appellant, and had files uniquely related to Ap-

pellant saved on it (*e.g.*, pictures of Appellant in uniform). Moreover, Appellant was the sole occupant of his dormitory room and his room was locked, at least when agents went to search it. Thus, the evidence supports the laptop seized belonged to Appellant, and that he was the primary, if not sole, user of the computer. Analysis of the computer found peer-to-peer software installed on it, evidence of search terms associated with child pornography, and evidence that files with names describing sexual conduct involving children had once resided on Appellant's computer.

Peer-to-peer networking software was not just installed on Appellant's computer, it had been run multiple times over an eight-day period beginning on the day the file with the QAQX hash value was downloaded to the computer using the IP address of Appellant's router. Although evidence of the QAQX hash value was not found on Appellant's computer, a linked file showed that a file with the exact same 124-character filename had been opened on Appellant's computer. The linked file showed the target file—that is, the file with the 124-character name—was originally placed on Appellant's computer on 22 June 2014 at 0653 hours. Special Agent WV testified his spreadsheet showed the file had downloaded to 6.22 percent at 0725 hours that same day to a computer connected to Appellant's router, eventually reaching 100 percent later in the day.

Because no videos of child pornography were ever found on Appellant's computer, and based upon the unique facts of this case, we have determined three inferences must be drawn from the evidence in order to conclude Appellant knowingly received child pornography. First, a factfinder would have to infer it was Appellant's computer, and not some other computer connected to his wireless router, that downloaded the file with the 124-character name. The linked file demonstrates the file with the 124-character name had been placed on Appellant's computer on 22 June 2014 and was later opened on 24 June 2014, indicating a file with that name did, in fact, reside on Appellant's computer. Although there is no evidence describing how Appellant came to download this particular file, evidence of Appellant's computer having used search terms related to child pornography along with the utilization of peer-to-peer networking software about the same time as the file being placed on Appellant's computer is strong circumstantial evidence that Appellant sought out, found, and chose to download the file with the 124-character name.

The second inference a factfinder would have to make is that the file with the 124-character name actually contained child pornography and not licit data. The QAQX hash value—the file's digital fingerprint—reveals that the file generating that hash value does, in fact, contain child pornography. No evidence was adduced that a particular hash value could simultaneously be

associated with a file containing child pornography and another file that did not. To the contrary, the trial testimony was that such a situation was a virtual impossibility. The evidentiary gap is that only the filename, and not the hash value, was found on Appellant's computer. This gap, however, is easily bridged by the fact the filename was both lengthy and explicit, indicating the sheer improbability of a user possessing innocuous data in a file with the exact same filename as one containing a video of children being sexually exploited. Any lingering doubt is eradicated by the evidence the file with the QAQX hash value—that is, the file demonstrably containing child pornography—was being downloaded through Appellant's router the same day a file with the exact same name appeared on Appellant's computer. This circumstantial evidence supports the conclusion that the file with the 124-character name on Appellant's computer was the same file as the one with the QAQX hash value, even though no actual video of child pornography was found on his computer.

The third necessary inference is that Appellant actually received the file with the QAQX hash value. "[E]vidence that a person has sought out—searched for—child pornography on the internet and has a computer containing child pornography images" can be circumstantial evidence of knowing receipt of child pornography. *King*, 78 M.J. at 222 (quoting *United States v. Pruitt*, 638 F.3d 763, 766 (11th Cir. 2011)). The term "receive" is not defined in the *Manual for Courts-Martial*, but the word "possessing" is, and possession is integral to the definition of "receive." *See, e.g., United States v. Olander*, 572 F.3d 764, 769 (9th Cir. 2009) (citations omitted).[9] "Possessing" is defined as "exercising control of something" and "[p]ossession inherently includes the power or authority to preclude control by others." *See* 2012 *MCM*, pt. IV, ¶ 68b.c.(5). Our superior court has described the test for possession of child pornography as whether an accused had "dominion and control" over the contraband. *See Navrestad*, 66 M.J. at 267–68. That possession also must be knowing and conscious. *Id.* at 267 (citation omitted).

In order for Appellant to download files with his peer-to-peer networking software, he had to consciously select files to be sent to his computer's shared folder. Once the file downloaded to the folder, Appellant had the ability to open, move, delete, or modify the file as he saw fit. Indeed, the fact the file disappeared from the shared folder after downloading to 100 percent is circumstantial evidence Appellant either moved or deleted the file, and the ex-

---

[9] When a military judge does not instruct upon a definition of a term, we determine the appropriate definition as part of our factual sufficiency analysis. *See United States v. Pease*, 75 M.J 180, 184 (C.A.A.F. 2016).

istence of the linked file is evidence a program on Appellant's computer was used to open the downloaded file. Other than opening the file, there is no evidence Appellant actually viewed the video, or, if he did, for how long.[10] Unlike a charge of viewing child pornography, the Government was not required to prove Appellant actually saw the child pornography. The Government did, however, have to prove Appellant's knowing receipt of it. This knowledge is established by Appellant's use of his computer to search for files by using terms indicative of child pornography, his selection of a file with a lengthy name explicitly describing sexual conduct with children aged 8 and under, and his use of his peer-to-peer software to completely download that file to his shared folder on his computer. All of which evidences his intent to receive as well as his actual receipt of the child pornography contained in the file with the hash value of QAQX. The evidence of his computer opening the file and his movement of the file out of his shared folder and off his hard drive shows Appellant's dominion and control over the file, proving his possession of it. Thus, circumstantial evidence establishes Appellant's knowing receipt of the charged video, despite the lack of evidence he ever watched the video and despite the fact the video was never found on his computer.

The final element of the offense requires proof that Appellant's conduct was of a nature to bring discredit upon the armed forces. Appellant was an American Airman stationed at a military installation in Japan and living in a military dormitory. He connected to the Internet using a local Internet service provider and used that connection to seek out and download a video of graphic child pornography. While he was downloading that file and while it remained in his shared folder, the sexually explicit filename describing the sexual abuse of small children was visible to—at a minimum—every user on the peer-to-peer network. Notably, Appellant came to the attention of law enforcement when an automated search utility saw Appellant's computer publicly sharing files with names indicative of child pornography. Although Appellant's conduct seemingly occurred in the privacy of his dormitory room unbeknownst to anyone else, his use of the peer-to-peer network to download child pornography was visible to untold numbers of other network users around the world, conduct which "has a tendency to bring the service into

---

[10] At trial, trial counsel argued that because another linked file was created six minutes later, Appellant must have watched the video for six minutes. The military judge was skeptical of this leap of logic, as are we. Considering the absence of any evidence as to how long Appellant had the video open for or that he even watched it at all, we conclude all the Government proved was that a program on Appellant's computer opened the file, creating a linked file in the process.

disrepute or which tends to lower it in public esteem." *See* 2012 *MCM*, pt. IV, ¶ 60.c.(3).

Having weighed all the evidence in the record of trial and made allowances for not having personally observed the witnesses, we find that a rational factfinder could have found Appellant guilty beyond a reasonable doubt of all the elements of receiving child pornography. Furthermore, we ourselves are convinced of Appellant's guilt beyond a reasonable doubt. Therefore, we find Appellant's conviction both legally and factually sufficient.

## B. Admission of Video Files into Evidence

Over the Defense's objection, the military judge admitted as a prosecution exhibit the two video files retrieved from the NCIS repository of child pornography with the hash values of QAQX and SDHI. At trial and on appeal, Appellant argues these two videos were neither found on nor downloaded from his computer, rendering their probative value slight and substantially outweighed by the danger of unfair prejudice and of confusing the members. Appellant further argues that because any offense of receipt was committed at the time the files were downloaded, any later viewing of the videos was irrelevant to the question of whether Appellant had knowingly received the videos. If the viewing was irrelevant, Appellant argues, then the videos themselves had little or no relevance and they therefore should not have been shown to the members in light of their inflammatory nature.

### 1. Additional Background

Trial defense counsel objected to the admission of the videos on an authentication theory because the videos came from the NCIS repository and not from the data seized from Appellant. Trial defense counsel further objected on relevancy grounds, arguing the probative value of the evidence was outweighed by the undue prejudice of showing the videos themselves, especially in light of Appellant's offer and ultimate agreement to stipulate to the graphic content of the videos. Although the military judge overruled trial defense counsel's objections to the admissibility of the videos, he determined playing the videos in their entirety "would be substantially more unfairly prejudicial than probative," considering the parties' stipulation. The military judge ruled trial counsel would be allowed to show only a 30-second segment from each of the two video files in order to permit the Prosecution to prove Appellant's knowledge of the videos' content and "to generally orient the members to the nature of the materials in question."[11] The military judge fur-

---

[11] During sentencing proceedings, the military judge permitted trial counsel to show a different 30-second segment than they showed during findings.

ther allowed trial counsel to show the first few moments of the QAQX video, consisting of text purporting to be from the video's creator that claimed to set out names and ages of the children in the video.

The military judge later sought to clarify his ruling, explaining that the entirety of the two videos was admissible, but that members would only be permitted to view the 30-second segments, as "limited clips are all that [Mil. R. Evid.] 403 would allow." The military judge then said he would consider allowing the members to view "other short clips as necessary" if the members are unable "to make a factual determination in this case" after viewing the original 30-second segments.

Trial counsel played the two 30-second segments and the introductory text from QAQX for the members during their case in findings. The military judge later instructed the members that he had "determined that the clips that [the members] saw were all that's necessary that [the members] see," but that the members could request to see more if needed "to make determinations in this case to determine whether the prosecution has proven its case beyond a reasonable doubt."

**2. Law**

We review a military judge's decision to admit or exclude evidence for an abuse of discretion. *United States v. Ediger*, 68 M.J. 243, 248 (C.A.A.F. 2010) (citation omitted). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be 'arbitrary, fanciful, clearly unreasonable, or clearly erroneous.'" *United States v. White*, 69 M.J. 236, 239 (C.A.A.F. 2010) (quoting *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010)). Military judges are afforded "considerable discretion" in deciding whether to admit evidence. *See United States v. Henley*, 48 M.J. 864, 871 (A.F. Ct. Crim. App. 1998), *aff'd*, 53 M.J. 488 (C.A.A.F. 2000).

Under Mil. R. Evid. 403, a military judge may exclude relevant evidence when that evidence's probative value is substantially outweighed by the danger of unfair prejudice. In assessing whether to admit evidence, the military judge must discount the probative value of the disputed evidence when: (1) the disputed evidence poses a risk of unfair prejudice, and (2) when there is an evidentiary alternative to the disputed evidence which has equal or greater probative value. *Old Chief v. United States*, 519 U.S. 172, 182–83 (1997). An accused's offer to stipulate to certain evidence "does not generally constitute an evidentiary alternative having equal or greater probative value." *United States v. Sewell*, 457 F.3d 841, 844 (8th Cir. 2006) (citation omitted). As a general matter, the prosecution is permitted to choose what evidence to use to prove its case, and an accused "may not stipulate or admit his way out

of the full evidentiary force of the case as the Government chooses to present it." *Old Chief*, 519 U.S. at 186–87.

In *Old Chief*, the United States Supreme Court determined the defendant's legal status as a felon would be adequately proven by a stipulation to that fact, and that evidence of the crimes leading to his status as a felon should not be admitted. *Old Chief*, 519 U.S. 191–92. In so ruling, the Court noted the "peculiarities of the element of felony-convict status" and explained in cases involving such elements, the general rule would be that a stipulation as to felon status would render evidence about the earlier offenses inadmissible. *Id.* On the other hand, when the evidence sought to be admitted is "evidence creating a coherent narrative of [the accused's] thoughts and actions in perpetrating the offense for which he is being tried," such evidence will "generally survive" an unfair prejudice challenge. *Id.*

Once exhibits are admitted in evidence, court members are generally given the exhibits to take with them into their deliberations. Rule for Courts-Martial (R.C.M.) 921(b). This general rule is subject to the caveat of "[u]nless otherwise directed by the military judge," highlighting judicial discretion regarding the delivery of exhibits to the members. *Id.* Showing excerpts of videos of child pornography admitted in evidence is a well-accepted practice in the federal courts for balancing the probative value of video evidence against its prejudicial effect, even over defense offers to stipulate to the videos' content and over objections similar to those raised here. *See, e.g.*, *United States v. Dudley*, 804 F.3d 506, 517–18 (1st Cir. 2015); *United States v. Cunningham*, 694 F.3d 372, 389–91 (3d Cir. 2012); *United States v. Caldwell*, 586 F.3d 338, 343 (5th Cir. 2009); *United States v. Ganoe*, 538 F.3d 1117, 1124 (9th Cir. 2008); *United States v. McCourt*, 468 F.3d 1088, 1091–93 (8th Cir. 2006).

### 3. Analysis

As discussed above, the evidence supporting the conclusion that the file with the QAQX hash value was downloaded to and opened by a program on Appellant's computer is compelling, and we are convinced beyond a reasonable doubt Appellant knowingly received that file. As a result, the fact the file was not found on his computer and the fact Special Agent WV was unable to download the file from Appellant are of no moment.

The Government was required to prove Appellant knowingly received child pornography. Part and parcel of that requirement was to establish Appellant's actual receipt of child pornography which, in this case, was the file with the QAQX hash value. The file itself proved that the data in the file was, in fact, material containing a visual depiction of minors engaging in sexually explicit conduct—child pornography. Although far from conclusive, there is some evidence Appellant viewed the video in question. The linked file on Ap-

pellant's hard drive is evidence the video was opened by a program on Appellant's computer. The Government was free to argue—and the members to conclude—that the linked file's existence supported the proposition that Appellant had purposely opened the file and viewed some or all of the video.[12]

The probative value of the video itself is four-fold. First, it proved the nature of the contraband Appellant had received. Second, the content of the video was probative of Appellant's knowledge that he was receiving child pornography, as opposed to a file containing innocuous data. Third, because possession is inherently included in receipt, the contents of the video along with evidence suggesting Appellant may have viewed the video tended to prove he knowingly and consciously possessed the child pornography. Fourth, the explicit nature of the video undercut the suggestion Appellant accidentally or unintentionally received the video, as an innocent recipient of the video would have likely taken such steps as alerting authorities or ceasing the use of peer-to-peer networking software.

We recognize the parties' stipulation did not simply brand the video as "child pornography;" it explicitly described the sexual conduct in the video. Nonetheless, we are mindful of the adage that a picture is worth a thousand words. Images of child pornography such as those in the videos at issue here are indisputably disturbing, amounting to visual records of severe child abuse. Appellant's attempts to shield the contents of the videos from the members is essentially an acknowledgment of the powerful impact of the evidence, the corollary of which is the gravity of Appellant's offense. Because child pornography is illegal, most people have never seen it and they may have an inaccurate impression of what it is. Moreover, the spectrum of child pornography is wide, both in terms of the conduct involved and the ages of the victims. The sheer severity depicted in the video Appellant downloaded is not readily reduceable to the written word without a substantial diminution in the viewer's ability to conceptualize what is occurring in the video and to appreciate the degree of criminality involved with downloading it. We cannot conclude the written stipulation in this case is an evidentiary alternative that has equal or greater probative value than the video itself. *See Sewell*, 457 F.3d at 844.

---

[12] We have greater reservations regarding the admissibility of the file with the SDHI hash value due to the absence of any evidence that file was ever opened by Appellant or by any program on his computer. Appellant, however, was acquitted of receiving this file, rendering harmless any error in admitting and showing that video.

We agree with the military judge, however, that there is a point at which the probative value of playing the video for the members is overwhelmed by its unfairly prejudicial impact. The military judge's decision to limit the presentation of the video to its introductory text and a 30-second segment was an acceptable approach to balancing the Government's right to prove its case with the court's obligation to avoid unfair prejudice to Appellant based upon the facts presented here. The 30 seconds shown to the members was a small fraction of the video's overall length and provided the members with sufficient information to allow them to understand the video's contents, consistent with the practice adopted in federal courts. The decision to restrict the Government to showing only an excerpt of a video is one within the discretion of the military judge, and we conclude the military judge did not abuse his discretion by doing so here.

## C. The Definition of "Receiving"

Appellant argues for the first time on appeal that the military judge erred by not providing the members a definition of the word "receiving" when describing the elements of the offense and relevant definitions.

### 1. Additional Background

At trial, both the Government and Defense were given the opportunity to review the military judge's proposed instructions and to either object to those or to request additional instructions. Trial defense counsel indicated they "may have a special instruction with regard to some of the language either from *Navrestad* or *[United States v.] Yohe*,[13] essentially sort of similar to our [R.C.M.] 917 [motion]."

Trial defense counsel's unsuccessful R.C.M. 917 motion for a finding of not guilty focused on the specification alleging possession of child pornography, of which Appellant was ultimately acquitted. The thrust of the argument for the motion was that Appellant did not exercise the requisite dominion and control over the thumbnail images due to them being in a temporary file in unallocated space on Appellant's hard drive. Without proving this dominion and control, trial defense counsel argued the Government had failed to prove Appellant's possession of the thumbnail images. Trial defense counsel's argument on the motion made no reference to the receipt specification.

Just after ruling on the R.C.M. 917 motion, the military judge said, "I note the [D]efense did send me a proposed instruction regarding citing [sic]

---

[13] No. ACM 37950, 2013 CCA LEXIS 686 (A.F. Ct. Crim. App. 22 Jul. 2013) (unpub. op.).

*U.S. v. Yohe* . . . [and] *U.S. v. Navrestad*, and I did incorporate in large part the gist of the [D]efense instruction as requested." Unfortunately, the military judge neither attached what was sent to him to the record as an appellate exhibit, nor did he explain what part of the Defense's proposed instruction he decided not to incorporate, so we are unable to determine with any precision either what the Defense requested or what "large part" of that request the military judge chose to incorporate. Nonetheless, we conclude trial defense counsel's instruction request pertained to the definition of possession, and not receipt.[14]

After the military judge announced he was incorporating a portion of the Defense's proposed instruction, he asked whether the Defense had any objection to the instructions or requested any additional instructions. Trial defense counsel answered in the negative.

Shortly thereafter, the military judge gave his instructions to the members. Rather than provide definitions for terms after each specification, the military judge set out the elements for both of the specifications, and then he provided a series of definitions. In this list of definitions, he defined "possessing" without specifying whether the term applied to the possession specification or the receipt specification or to both. After defining "possessing," the military judge said:

> [I]f you are convinced beyond a reasonable doubt that the accused exercised control over the charged images during the charged time frame, you may find the accused guilty of the offense *of possession* of child pornography if you otherwise find

---

[14] It appears that the instruction the military judge gave by virtue of trial defense counsel's request added a fifth sentence, as emphasized below, to the standard definition of "possessing." The instruction, as given to the members, was:

> "Possessing" means exercising control of something. Possession may be direct physical custody like holding an item in one's hand, or it may be constructive, as in the case of a person who hides something in a locker or a car to which that person may return to retrieve it. Possession must be knowing and conscious. Possession inherently includes the power or authority to preclude control by others. *In order for an accused to be convicted of possessing files that were only contained in areas of a computer that are inaccessible to an average user, the evidence must demonstrate beyond a reasonable doubt that the accused knew the images were located in that location and that the accused had the ability to exercise control of the files in that space.*

(Emphasis added).

that each element of the offense has been established beyond a reasonable doubt.

(Emphasis added). For other terms, the military judge indicated they pertained to both possession and receipt.

**2. Law**

Military judges have wide discretion in fashioning instructions, but those instructions must give the members "an accurate, complete, and intelligible statement of the law." *United States v. Behenna*, 71 M.J. 228, 232 (C.A.A.F. 2012) (citations omitted). We review military judges' instructions de novo. *United States v. Hale*, 78 M.J. 268, 274 (C.A.A.F. 2019) (citation omitted). In assessing whether an instruction was erroneous, we must determine whether the instruction sufficiently covers the issues in the case and whether, in the context of all the instructions given, the instruction "completed its purpose." *Behenna*, 71 M.J. at 232 (citation omitted); *see United States v. McDonald*, 57 M.J. 18, 20 (C.A.A.F. 2002) (citation omitted).

Under R.C.M. 920(f), the absence of an objection to a particular instruction or to the omission of an instruction prior to the members starting their deliberations means the objection is forfeited. *United States v. Davis*, ___ M.J. ___, No. 19-0104, 2020 CAAF LEXIS 76, at *7 (C.A.A.F. 12 Feb. 2020) (citations omitted). Forfeited objections on instructions are unpreserved for appeal and reviewed for plain error. *United States v. Tunstall*, 72 M.J. 191, 193 (C.A.A.F. 2013) (citation omitted). However, the United States Court of Appeals for the Armed Forces (CAAF) has held that if an appellant affirmatively waives any objection to findings instructions, the issue is waived and there is "nothing left for us to correct on appeal." *Davis*, 2020 CAAF LEXIS 76, at *7 (citations omitted).

Pursuant to Article 66(c), UCMJ, the courts of criminal appeals have the unique statutory responsibility to affirm only such findings of guilt we find correct and "should be approved." Thus, we retain the power to address errors raised for the first time on appeal in the face of waiver of those errors at the trial level. *See, e.g., United States v. Hardy*, 77 M.J. 438, 442–43 (C.A.A.F. 2018); *United States v. Chin*, 75 M.J. 220, 223 (C.A.A.F. 2016); *United States v. Quiroz*, 55 M.J. 334, 338–39 (C.A.A.F. 2001).

**3. Analysis**

Appellant argues that the military judge should have provided a definition of receipt which explained, at a minimum, that possession is an integral part of receipt. Without proposing a specific definition, Appellant asserts the absence of a definition deprived his trial defense counsel of the ability to argue he never exercised sufficient dominion or control over the file with the QAQX hash value in order to legally possess it (and therefore did not receive

19

it). Due trial defense counsel affirmatively stating they did not object to the instructions and did not request any additional instructions, this alleged error was waived. We have considered whether we should grant relief under our Article 66(c) authority in spite of this waiver, and we decline to do so based upon the absence of material prejudice to Appellant.

As explained above, we agree with Appellant that possession is inherent in the concept of receipt. One cannot receive something without also possessing it, even if for just a fleeting moment. We disagree, however, with Appellant's proposition that the military judge should have *sua sponte* fashioned a definition of receipt for his instructions. As we have noted, the *Manual for Courts-Martial* defines "possession," but it does not define "receiving." Yet, the term is not so esoteric or complex to give rise to plain error when a military judge does not provide a definition. The fact the term appears, undefined, in more than a dozen other punitive articles in the *Manual for Courts-Martial* is a strong indication the term "receiving" is an ordinary word well within the common knowledge of court members.[15] To receive a tangible item simply means to take possession or delivery of it, or to knowingly accept it.[16] "[W]ords generally known and in universal use do not need judicial definition." *United States v. Bailey*, 77 M.J. 11, 15 (C.A.A.F. 2017) (quoting *United States v. Nelson*, 53 M.J. 319, 321 (C.A.A.F. 2000)). Although there are other uses of the term—such as receiving guests, receiving news, or receiving a scholarly degree—receiving child pornography can only logically mean taking possession of the material which contains the child pornography, whether it is a magazine, a disc, or a file downloaded from the Internet.[17] Although there is overlap between "possessing" and "receiving" materials containing child pornography, as a person who receives such material simultaneously possesses it, the concept of receiving material indicates an accused engaged

---

[15] *See, e.g.*, Article 101, UCMJ, 10 U.S.C. § 901 (disclosing a countersign to a person not entitled to receive it); Article 132, UCMJ, 10 U.S.C. § 932 (receiving a receipt for a payment less than the actual payment); 2016 *MCM*, pt. IV, ¶ 53.c.(2) (receiving a threat as part of extortion); 2016 *MCM*, pt. IV ¶ 66.b.(1) (receiving a thing of value as part of bribery or graft); 2016 *MCM*, pt. IV, ¶ 97.b.(4) (receiving consideration for arranging for sexual acts); 2016 *MCM*, pt. IV, ¶ 106.b (receiving stolen property).

[16] *See, e.g.*, *Webster's Third New International Dictionary: Unabridged*, 1894 (1966); *United States v. Olander*, 572 F.3d 764, 768–69 (9th Cir. 2009).

[17] The child pornography provision in the *Manual for Courts-Martial* also prohibits "viewing" child pornography, undercutting any argument that "receiving" in this context would include a case of looking at child pornography without actually taking possession of it.

in some sort of transaction or exchange with another to obtain the material, whereas possession is simply the state of having the material. In the child pornography arena, the concept of receipt takes on a heightened significance, as it is the incessant sharing and distribution of these images that causes the harm to the victims and society to metastasize at a precipitous pace. A recipient of these images is a consumer in the global child-pornography marketplace, driving up demand in some incremental degree each time the recipient downloads another image or video. In that sense, the criminality behind receiving child pornography is distinct from simple possession of the same. *See, e.g.*, *United States v. Burrows*, 905 F.3d 1061, 1064–65 (7th Cir. 2018).

Where the military judge did inject confusion into the instructions was when he failed to explain that the definition of possession applied to the offense of receiving child pornography. By not providing definitions separately to each specification, the military judge's definitions are read to apply to both specifications unless he indicated otherwise. The military judge did not say that the definition of possession only applied to the possession specification, leaving the members free to use the term to determine whether or not Appellant had possessed the videos he was charged with receiving. But the military judge went further by explaining Appellant could be convicted of the possession offense *if* the members were convinced he had "exercised control over" the thumbnail images. He did not, however, explain that Appellant could be convicted of the receipt offense only upon a conclusion Appellant had exercised control over the videos. The members could thereby interpret the military judge's instructions as saying that they only needed to find control over the contraband for possession, and not for receipt. Such an interpretation would be an incorrect view of the law. The members, however, could also reasonably interpret the military judge's instructions to mean that the Government was required to prove "control over" the images for the possession specification and "receipt of" for the receiving specification. Applying the ordinary definition of "receiving," the members could have then correctly concluded that receiving entailed possession (as defined by the military judge) and not placed any significance on the fact the military judge said the Government only had to prove "control over" the images for the possession specification.

The military judge was responsible for giving "accurate, complete, and intelligible" instructions. *See Behenna*, 71 M.J. at 232 (citation omitted). On this point, he fell short, and we find his limitation of the "control over" instruction to the possession specification to be error. As explained above, the military judge's instructions were ambiguous on this point because they were incomplete. In this case, the members could have reached the wrong legal understanding if they concluded the military judge was telling them that possession was not a component of receipt *and* that the Government need not prove Appellant's control over the videos in order to find receipt. The better

approach to these instructions would have been to clearly apply the concept of possession to both the receipt and the possession specifications, defining the term receipt as taking possession of something.

The military judge's error, however, was attenuated by the definition of "wrongful" he gave the members, which was:

> "Wrongful" means without any legal justification or excuse. Any facts or circumstances that show that a visual depiction of child pornography was unintentionally or inadvertently acquired are relevant to wrongfulness, including, but not limited to, the method by which the visual depiction was acquired, the length of time the visual depiction was maintained, and whether the visual depiction was promptly, and in good faith, destroyed or reported to law enforcement.

The requirement that Appellant's conduct be proven to be wrongful applied to both the possession and the receipt specification. By so instructing the members, the military judge reinforced the concept that Appellant needed to "acquire"—that is, take possession of—the child pornography in question in order to be convicted of either possessing or receiving it.

We further conclude Appellant's defense was not hampered in any way by the military judge's instructions. His trial defense counsel did not argue Appellant never received the video files in question, rather they argued the members should infer Appellant deleted the files because he did not want them.[18] Considering the Defense's decision to not argue Appellant had never downloaded the videos in the first place, instead arguing he had downloaded and then deleted them, the military judge's failure to clarify that possession was inherent in receipt did not impact the Defense's argument. The Defense effectively conceded Appellant's possession of the videos by arguing he had the ability to delete them, and Appellant was not prejudiced by the military judge's instructions as to the definitions relevant to the offenses he was charged with. As a result, Appellant is not entitled to relief.

**D. Verbatim Transcript**

Appellant argues that the transcript of his trial is not verbatim, rendering his record of trial defective. As a remedy, Appellant asks this court to set aside his dishonorable discharge. Although flawed, we find the transcript in

---

[18] For example, when discussing the receipt charge, trial defense counsel argued Appellant "saw some weird stuff and then he deleted it," and, "[m]ost likely he's just a guy who saw some stuff and opted to get rid of some things he didn't want."

22

this case to be substantially verbatim, and we will not disturb his discharge based upon this alleged error.

### 1. Additional Background

The 1008-page transcript of Appellant's trial contains nearly 300 instances of the annotation, "[indiscernible]." The annotations appear to replace portions of testimony, although the record does not indicate the lengths of those portions. The first "[indiscernible]" annotation occurs on page 23 of the record, and subsequent annotations appear regularly through page 1006. From counsels' questions to witnesses' answers to comments from the military judge to statements by the members, no part of the record is untouched by the annotations.

The annotations appear in a wide variety of passages throughout the record. Some are plainly unrelated to any significant aspect of the case, for example:

> [Senior Defense Counsel (SDC)]: I'm going to retrieve that from you.
>
> [Documents almost dropped.]
>
> [Witness (WIT)]: Sorry, sir.
>
> SDC: Could have been a disaster if we—
>
> WIT: Yeah. I'm going to go ahead and—
>
> SDC: [Indiscernible] I apologize about that.

(Second and fourth alterations in original).

Many passages are more substantive, but tend to provide context for the deleted text. For example:

> [Senior Trial Counsel]: So is this an indication to you at all that he was—that there was an installing, uninstalling, do you have—was there evidence that that kind of thing was going on?
>
> [Mr. BW]: Yes, ma'am, there was [indiscernible] an uninstalled script related to this Shareaza program that was run I believe like three times, I want to say like on 22 June. But it looks like—it appeared to us that it was just being uninstalled reinstalled.

(Third alteration in original).

Some passages, however, are far more inscrutable, such as:

> [Mr. BW]: So [indiscernible] email three [indiscernible] what was found in email one from the page before same email ad-

23

> dress just different send date and time and last modified and viewed date and times.

(Second and third alterations in original).

### 2. Law

We review questions of whether a record of trial is complete and a transcript is verbatim de novo. *United States v. Davenport*, 73 M.J. 373, 376 (C.A.A.F. 2014) (citation omitted). "Article 54(c)(1), UCMJ, 10 U.S.C. § 854(c)(1), requires a 'complete' record of the proceedings and testimony to be prepared for any general court-martial resulting in a punitive discharge." *United States v. Lovely*, 73 M.J. 658, 676 (A.F. Ct. Crim. App. 2014). A complete record of trial in such a case includes a verbatim transcript. R.C.M. 1103(b)(2)(B). "A verbatim transcript includes: all proceedings including sidebar conferences, arguments of counsel, and rulings and instructions by the military judge . . . ." *Id.*, Discussion.

Although the Rules for Courts-Martial call for "verbatim" transcripts, this requirement has been read by our superior court to not mean "word for word," but rather, "substantially verbatim." *Davenport*, 73 M.J. at 377 (citation omitted); *see also United States v. Lashley*, 14 M.J. 7, 9 (C.M.A. 1982) ("literal compliance with this requirement is impossible"); *United States v. Nelson*, 13 C.M.R. 38, 42 (C.M.A. 1953) ("Many, if not all, records fail to record every word spoken at a hearing."). To determine whether a record is complete or whether a transcript is verbatim, "the threshold question is 'whether the omitted material was substantial,' either qualitatively or quantitatively." *Davenport*, 73 M.J. at 377 (quoting *Lashley*, 14 M.J. at 9) (internal quotation marks omitted) (additional citation omitted). This threshold is met when the omitted material "'related directly to the sufficiency of the Government's evidence on the merits,' and 'the testimony could not ordinarily have been recalled with any degree of fidelity.'" *Id.* (quoting *Lashley*, 14 M.J. at 9). "Omissions are quantitatively substantial unless 'the totality of omissions . . . becomes so unimportant and so uninfluential when viewed in the light of the whole record, that it approaches nothingness.'" *Id.* (alteration in original) (quoting *Nelson*, 13 C.M.R. at 43).

Each case is analyzed individually to decide whether an omission is substantial. *United States v. Abrams*, 50 M.J. 361, 363 (C.A.A.F. 1999) (citation omitted). "A substantial omission renders a record of trial incomplete and raises a presumption of prejudice that the Government must rebut." *United States v. Henry*, 53 M.J. 108, 111 (C.A.A.F. 2000) (citing *United States v. McCullah*, 11 M.J. 234, 237 (C.M.A. 1981)) (additional citations omitted). "Insubstantial omissions from a record of trial do not raise a presumption of prejudice or affect that record's characterization as a complete one." *Id.* Rec-

ords which are not substantially verbatim or which are incomplete will not support sentences including either a punitive discharge or more than six months of confinement. R.C.M. 1103(b)(2)(B), 1103(f).

### 3. Analysis

This transcript contains more than its fair share of annotations indicating information is missing from the record. The record, however, is more than 1,000 pages long, meaning it contains approximately 25,000 lines of transcription. Placed in that context, the "[indiscernible]" annotation appears in just over one percent of the lines in the record. In other words, when considering the transcription on a line-by-line basis, nearly 99 percent of the lines in the record do *not* reflect omissions. Based upon our careful review of the record, considering the context of the words surrounding the omissions, to include follow-up and clarifying comments, we are confident nearly all the omissions constitute one or two words.

For example, the record shows the military judge asked one witness, "So of that million images it might be [indiscernible] actual separate images just represented by different hash values?" The witness then answered, "The other way around. It's about a million images but between them probably about five million hash values." The military judge then added, "Okay, so a million independent, [indiscernible] separate images, okay, gotcha." The context of this particular exchange is that the witness was explaining that a particular repository of child pornography had approximately one million images in it and that there are different algorithms for creating hash values; thus, a single file will have multiple hash values. Although not completely clear, we conclude where the record shows "[indiscernible]" annotations, the military judge likely said "five million" the first time and something like "discrete" or "individual" the second time.

We do not see any evidence that lengthy exchanges or passages have been replaced by the "[indiscernible]" annotations. Other than these annotations, the record indicates a focused attention to detail by the court reporter. For example, when one of the trial counsel inappropriately mocked one of the trial defense counsel, the court reporter carefully described the trial counsel's affect in the record. In comparing portions of the record describing the dense, data-filled exhibits in this case, we find the record to be precise, even where counsel were referencing lengthy filenames with unconventional spellings, times, file extensions, and IP addresses. This degree of care leads us to conclude that had the court reporter been unable to transcribe any significant quantity of the proceedings, she would have indicated that in the record itself. We do not find a quantitatively substantial amount of the trial is missing from the transcript.

We have also considered whether qualitatively substantial information is missing from the record, and we answer that question in the negative. Because of the complex nature of the evidence in this case, most of the contested issues were covered and re-covered multiple times during the testimony. In many cases, trial counsel, trial defense counsel, the military judge, and even the members asked clarifying questions. Moreover, the arguments by counsel, including trial defense counsel's argument on the R.C.M. 917 motion, flowed clearly from the the record. Had substantial information been omitted from the record, we would expect to find portions of the arguments untethered to the record or referring to concepts presented by witnesses uncaptured earlier in the transcript. We found counsels' arguments directly tied to or fairly arising from the record, leading us to conclude the information omitted by virtue of the "[indiscernible]" annotations was not qualitatively substantial. The transcript in this case is substantially verbatim.

## E. Jurisdiction over Appellant

Appellant asserts his court-martial was lacking jurisdiction over him under the theory he had been medically retired from the Air Force prior to trial.

### 1. Additional Background

Although Appellant's offense occurred in June 2014, he was not brought to trial until 7 May 2018. In the interim, Appellant met a medical evaluation board and was notified on 18 October 2017 that he would be "permanently disability retired" effective 1 January 2018. Two days before that effective date, Appellant asserts he received an email stating his DD Form 214 "was official, and would be ready for download the day after [his] effective separation date" from the Air Force's online personnel system. He was also given a retiree identification card and information about the retiree benefits he would receive once he returned to the United States. He was further told he would receive "payments for [his] disability," and such payments were about to commence. But, on 26 January 2018, he received another email notifying him that his retirement had been "rescinded" that same day, and that he should destroy the DD Form 214, due to it being "no longer official."

Unsurprisingly, Appellant's pay went into disarray after these events. Appellant did not receive pay after the effective date of his later-rescinded medical retirement until mid-February, and even then he only received a fraction of it, about one-third of his monthly E-5 pay. The Defense Finance and Accounting Service (DFAS) persisted in underpaying Appellant through his May court-martial.

Appellant did not raise the subject of jurisdiction at his court-martial. The issue of jurisdiction only came up while the members were deliberating on findings when the military judge asked trial defense counsel whether they

agreed that Appellant had been "extended on active duty for administrative purposes for these proceedings." Trial defense counsel answered in the affirmative.

Even after Appellant was well into serving his term of confinement, his trial defense counsel effectively conceded the court-martial's jurisdiction in the letter she submitted as part of Appellant's request for clemency in which she primarily discussed the impact Appellant's punitive discharge would have on his ability to get medical treatment. In her 23 August 2018 letter, she wrote:

> The prosecutors had to cancel [Appellant's] retirement orders and bring him back onto active duty in order to complete his court martial. It is not the Defense's contention that this is in-an-of-itself [sic] unjust. The enforcement of the rule of law is crucial to a democratic society and an efficient military force.

The Government has not sought to rebut the foregoing, instead arguing the evidence is insufficient to prove Appellant had retired or otherwise separated from the service prior to trial.

**2. Law**

Article 2, UCMJ, 10 U.S.C. § 802, sets out court-martial *in personam* jurisdiction. The Government has the burden of proving jurisdiction by a preponderance of the evidence when jurisdiction is challenged. *Hale*, 78 M.J. at 270 (citation omitted). Jurisdiction ceases to exist over servicemembers discharged from the military, "absent some saving circumstance or statutory authorization." *United States v. Hart*, 66 M.J. 273, 275 (C.A.A.F. 2008) (quoting *United States v. Howard*, 20 M.J. 353, 354 (C.M.A. 1985)) (additional citation omitted). We review issues of personal jurisdiction de novo. *United States v. Christensen*, 78 M.J. 1, 4 (C.A.A.F. 2018) (citation omitted).

Our superior court has looked to three criteria in considering whether a servicemember's discharge is final and jurisdiction has terminated: "(1) the delivery of a discharge certificate (a DD Form 214); (2) a 'final accounting of pay;' and (3) the completion of the 'clearing' process that is required under service regulations." *Id.* (quoting *Hart*, 66 M.J. at 276–79). These criteria amount to guidance, and they are not binding when they yield a result that goes against reason or policy. *Id.* (quoting *United States v. Nettles*, 74 M.J. 289, 291 (C.A.A.F. 2015)).

Court-martial jurisdiction extends to retired servicemembers who are entitled to pay. Article 2(a)(4), UCMJ, 10 U.S.C. § 802(a)(4); *United States v. Dinger*, 77 M.J. 447, 453 (C.A.A.F. 2018). This jurisdiction encompasses members both temporarily and permanently retired due to disability. *United*

*States v. Stevenson*, 53 M.J. 257, 260 (C.A.A.F. 2000); *United States v. Bowie*, 34 C.M.R. 411, 412 (C.M.A. 1964).

### 3. Analysis

At trial, Appellant affirmed the position that he had been "extended on active duty for administrative purposes" for trial proceedings. Now, on appeal, Appellant asserts he had been medically retired and placed on the permanent disability retirement list prior to his trial. There is no evidence—and Appellant does not argue—that he was simply discharged from active duty. Instead, Appellant points to receiving his retiree identification card and information about the benefits he would receive from the Veterans Administration, to include "payments for [his] disability," as evidence of his medical retirement.

Our superior court has pointed out that the "overarching interest implicated by the law of personal jurisdiction, and especially discharge jurisprudence, is the need—of both servicemember and service—to know with certainty and finality what the person's military status is and when that status changes." *Nettles*, 74 M.J. at 291 (citation omitted); *see also Howard*, 20 M.J. at 354. Unquestionably, the Government's actions clouded Appellant's precise status in the months leading up to his court-martial by sending him a retiree identification card, preparing his DD Form 214, notifying him his DD Form 214 was available for him to download, and stopping his pay while at the same time requiring him to stay on base and continue his military duties. Recognizing at least a portion of its error, the Government told Appellant to destroy the DD Form 214 and canceled his retirement after the earlier-established effective date. For reasons we cannot divine, the Government never did determine how to correctly pay Appellant.

In spite of the confusion over Appellant's status, we are confident he was still on active duty at the time of his trial based upon the absence of evidence Appellant completed any sort of clearing process to separate him from the service. Indeed, Appellant himself points to the fact he was not permitted to depart Japan and return to the United States prior to trial. Moreover, Appellant's argument he was medically retired is squarely opposed to the position he took, through counsel, both at trial and in his clemency submission. Based upon the evidence presented, we are not persuaded by his new post-trial claim that he was, in fact, not extended on active duty for the purpose of trial, but rather had been placed on the permanent disability retirement list. The Government's sending of contradictory messages to Appellant about his duty status is far from a practice to be emulated, but the totality of the circumstances leads us to conclude Appellant's medical retirement had not been finally executed prior to his trial. We further note that even if he had been medically retired, such retirement would not have severed military court-

martial jurisdiction over him. Thus, we conclude Appellant's period of active duty had been extended for the purposes of his trial, his court-martial had jurisdiction over him, and he is not entitled to relief.

### F. Appellant's Pay

Appellant argues for the first time on appeal he was subjected to illegal pretrial punishment by virtue of not receiving the full pay he was entitled to from January to May 2018 and by the Government seeking to recoup some portion, if not all, of what he was paid during that time. Appellant asks this court to set aside his punitive discharge as a remedy. The Government asserts we have no jurisdiction to consider the issue, arguing Article 66(c), UCMJ, does not grant us jurisdiction over a pay dispute unconnected to the approved sentence in a case. Alternatively, the Government argues Appellant is not entitled to relief under Article 13, UCMJ, due to the fact he was not in pretrial confinement at the time of the pay issues.

#### 1. Additional Background

As noted above, DFAS underpaid Appellant from January through May 2018. In the declaration he filed with this court, Appellant states he tried to rectify his pay at the time by going to the base Finance office where he was told, "they didn't want to overpay [him] which would result in [him] owing the government money." Finance personnel also told Appellant he would be paid once "the system has corrected itself." Despite his efforts, Appellant did not receive his full E-5 pay.

Appellant did not raise any issues regarding his pay during his May 2018 court-martial or otherwise assert he had been punished illegally prior to trial. However, in his August 2018 clemency request, Appellant wrote:

> I had my retiree ID, my DD-214 and started receiving my benefits. Nonetheless, I was still trapped in Japan not able to leave, still having to put on the military uniform and come into work because my leadership still said I had to even though I wasn't getting paid. No one cared about me enough to even make sure I got a pay check or was even kept on active duty. . . . Even as a retiree with an ID card, a DD-214, and no paycheck (either active duty or retired) my unit still had me on a curfew. The [U.S. Department of Veterans Affairs] was waiting for my arrival back in the [U.S.] so they could start my benefits ASAP. Four months of me stuck in Japan they sent me a letter saying they will at least start my payments for my disability. . . . I was trapped in Japan unable to go live out whatever life I have left. I know I wasn't in confinement, but over the last four years, I certainly haven't been free.

Near the end of 2018, after Appellant had completed his term of confinement, DFAS sought to take back a portion of the partial payments he had received, asserting he owed a debt to the Department of Defense. When Appellant disputed this debt, DFAS sent him letter on 15 March 2019 stating:

> Your debt $692.83, is due to payments received after you entered a No Pay Status (NPS), due to Date of Separation (D.O.S.) on January 01, 2018. These payments are as follows, a partial payment in the amount of $1,000.00 dated April 17, 2018, and a partial payment in the amount of $2,000.00 dated May 01, 2018. while [sic] on active duty with the United States Air Force. Your debt is due to Separation Payment. We have no record of returned payments.

DFAS further informed Appellant the debt had been sent to collections. When Appellant tried again to dispute the debt, he received a terse response on 25 March 2019 that simply said, "Per the agency, the debt is valid and collection should continue."

According to the declaration filed with this court, Appellant asked his first sergeant to contact DFAS and help resolve the problem, and Appellant says he "contacted a former supervisor to notify him of the issue." We cannot ascertain what, if anything, either of these two individuals did in response to Appellant's entreaties. The Government has not sought to rebut Appellant's factual allegations.

**2. Law**

Whether Appellant should receive relief for illegal pretrial punishment is a question we review de novo. *United States v. Mosby*, 56 M.J. 309, 310 (C.A.A.F. 2002). Appellant has the burden of establishing his entitlement to credit for an alleged Article 13 violation. *Id.* (citation omitted). Under Article 13, UCMJ:

> No person, while being held for trial, may be subjected to punishment or penalty other than arrest or confinement upon the charges pending against him, nor shall the arrest or confinement imposed upon him be any more rigorous than the circumstances required to insure his presence, but he may be subjected to minor punishment during that period for infractions of discipline.

This provision prohibits "intentional imposition of punishment" prior to trial, as well as unnecessarily rigorous arrest or pretrial confinement conditions. *United States v. Crawford*, 62 M.J. 411, 414 (C.A.A.F. 2006) (citations omitted). Confinement is not a prerequisite for relief under Article 13. *See, e.g.*, *United States v. Guardado*, ___ M.J. ___, No. 19-0139, 2020 CAAF LEXIS 17,

at *8–9 (C.A.A.F. 15 Jan. 2020); *Howell v. United States*, 75 M.J. 386, 393–94 (C.A.A.F. 2016); *United States v. Combs*, 47 M.J. 330, 332–34 (C.A.A.F. 1997). In assessing whether an appellant was subjected to illegal pretrial punishment, the test is: "was there an intent to punish or stigmatize a person awaiting disciplinary action, and if not, were the conditions . . . in furtherance of a legitimate, nonpunitive, government objective." *United States v. Starr*, 53 M.J. 380, 382 (C.A.A.F. 2000) (citations omitted).

In the face of an Article 13 violation, meaningful relief in the circumstances of a particular case may extend beyond confinement credit and may involve setting aside or mitigating a punitive discharge. *See United States v. Zarbatany*, 70 M.J. 169, 177 (C.A.A.F. 2011).

When an appellant fails to seek sentence relief for pretrial punishment at trial, the issue is waived absent plain error. *United States v. Inong*, 58 M.J. 460, 465 (C.A.A.F. 2003) (citation omitted). Even if waived, Article 66(c), UCMJ, calls upon the courts of criminal appeals to only affirm sentences which are correct in law and fact and which should be approved. *See, e.g.*, *United States v. Gay*, 74 M.J. 736 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2006).

### 3. Analysis

We disagree with the Government's position that we do not have jurisdiction to review Appellant's claim. Appellant has raised his denial of pay as allegedly illegal pretrial punishment under Article 13, UCMJ, which we and our superior court have consistently exercised jurisdiction over. Indeed, the CAAF just recently considered whether the partial withholding of pay from a servicemember awaiting a rehearing after his sentence had been set aside amounted to an Article 13 violation. *Guardado*, 2020 CAAF LEXIS 17, at *5–9; *see also Howell*, 75 M.J. at 393–94.

The Government's position that Article 13 requires an appellant to have been in pretrial confinement is similarly misplaced. In *Combs*, the CAAF determined that Article 13 applies to servicemembers "held for trial," and concluded the appellant in that case—who was awaiting a rehearing on the set-aside findings as to one charge and the sentence—was protected by Article 13 (the CAAF noted that the appellant was not afforded "complete freedom of movement"). 47 M.J. at 333. Appellant here was similarly awaiting trial after an earlier charge was withdrawn after he was arraigned on it. Whatever can be said of DFAS's view of Appellant's active-duty status, it is clear Appellant was not free to simply leave Japan at the end of his term of service or upon his medical retirement, as he was involuntarily retained on active duty for the purpose of being tried by court-martial. Although not in pretrial confine-

ment, Appellant was being held for trial, and was therefore covered by the protections of Article 13.

Appellant's pay issues arise from two related, yet distinct, sets of circumstances. The first is Appellant's diminished pay in the months leading up to his confinement when the Government processed Appellant's medical retirement and then subsequently rescinded that retirement. The second is the Government's later establishment of a debt on Appellant's part based upon some portion of the funds he was paid during the medical-retirement tumult.

Appellant did not raise the diminished-pay issue at trial. In fact, his trial defense counsel asserted on the record that Appellant had not been punished in any way prior to trial constituting illegal pretrial punishment under Article 13. The military judge then turned to Appellant and said:

> Article 13 of the UCMJ talks about what the command or what the Air Force can do with someone prior to trial, essentially saying that no one should be punished prior to trial because you shouldn't be punished until you've been convicted. Do you believe that anybody in a position of command or authority has done anything to you prior to trial that's been done for punishment purposes?

Appellant answered in the negative.

As a result, Appellant has waived this issue absent plain error. Having reviewed Appellant's post-trial submissions along with all the evidence in this case, we find no indication of any intent to punish or stigmatize him. To the contrary, it appears Appellant's medical condition had triggered his medical retirement, catching those responsible for military justice off-guard. This led Appellant's command to scramble to reverse the retirement in light of the fact Appellant was pending court-martial (and had been at least since charges were originally preferred in 2015). Amidst this confusion, Appellant's pay was sent into a tailspin from which it would never recover. The attention being paid to Appellant's duty status as he approached trial was lacking, but we see no command intent to punish him, especially since command cannot be imputed with the knowledge that DFAS would the stop Appellant's pay. Personnel at Appellant's finance office seemed to be operating under the assumption that "the system" would correct his pay. These same personnel suggested the reason for Appellant's pay decrease was to avoid creating a debt on Appellant's part—a legitimate, non-punitive objective, even if seemingly disconnected from the facts of Appellant's case. Had Appellant raised this issue at trial, we would have a more complete record to review his claim. Instead, he waived the issue. Looking for plain error, we find none, and Appellant is not entitled to relief under Article 13 for his reduced pay leading up to his

trial. Based upon the evidence presented, we similarly find no relief warranted under Article 66(c), UCMJ.

Appellant's debt issue did not arise until after he completed his term of confinement, so we would not have expected him to raise it at trial. But, once Appellant was tried, he was no longer being "held for trial," and Article 13 ceased to apply to him. *See United States v. Kreutzer*, 70 M.J. 444, 447–48 (C.A.A.F. 2012). Although the payments purportedly creating Appellant's debt occurred while he was being held for trial, the actual enforcement of the debt (if not the determination Appellant had the debt in the first place) occurred after Appellant's trial, rendering Article 13 inapplicable to this claim. Whatever merit, or lack thereof, there is to DFAS's conclusion that Appellant owes a debt by virtue of being underpaid, this issue falls outside the purview of Article 13, and we cannot grant him relief.

### III. CONCLUSION

The findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court